[Cite as *State v. Christian*, 2014-Ohio-2672.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

     Plaintiff-Appellee                          :                    C.A. CASE NO.     25256

v.                                                              :                    T.C. NO.     11CR563

EVA CHRISTIAN                                      :                     (Criminal appeal from
                                                                                      Common Pleas Court)

     Defendant-Appellant                     :

                                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____20th_____ day of _____June_____, 2014.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162 and MATTHEW T. CRAWFORD, Atty. Reg. No. 0089205, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorneys for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. No. 0084707, 15 W. Fourth Street, Suite 100, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

{¶ 1} Eva Christian was found guilty by a jury in the Montgomery County Court of Common Pleas of two counts of insurance fraud, two counts of making false alarm, and one count of engaging in a pattern of corrupt activity. She was sentenced to an

aggregate term of nine years of imprisonment, was ordered to pay restitution totaling more than $80,000, and was ordered to forfeit her home.   Christian appeals from her convictions.

{¶ 2}   For the following reasons, the judgment will be affirmed in part, as modified, and reversed in part.   The matter will be remanded for resentencing on Counts Two and Three and for entry of a judgment consistent with this opinion.

*Facts*

{¶ 3}   The State's evidence established the following facts:

{¶ 4}   In 2009, Christian set in motion a plan for committing insurance fraud.   She sent a letter to Jack Presley, seeking his assistance, but Presley was in jail; it is unclear how Christian knew Presley.   Presley's stepfather, Darryl Adams, opened Christian's letter to Presley and contacted Christian himself.   Christian,  Adams, and Adams's wife, Diane Jones, had conversations and meetings to discuss staging a burglary at Christian's house on Saint Laurent Circle in Washington Township.   They also discussed Christian's hiring Adams for a painting project at her home, to provide a legitimate basis for their relationship.   Christian laid out a plan by which she would box up the items she wanted Adams to take and would leave a garage door unlocked.   She offered to pay Adams and Jones $1,000 for the job, with $500 paid up front and the rest to be paid when she got the insurance check.

{¶ 5}   On October 9, 2009, Adams and Jones went to Christian's house, entered through the unlocked garage door, and removed numerous items that Christian had boxed or wrapped in a bed sheet.   Adams also used a "tire tool" on the door to make it look as if someone had broken in.   Christian had paid them to put her items in storage, but Adams and Jones spent the money on drugs and kept Christian's belongings at their house.

**{¶ 6}** On October 11, 2009, Christian reported a burglary at her home. She reported to Montgomery County Sheriff's deputies that televisions, computers, designer purses, video game systems, several types of currency, and other items were missing from her home. She filed an insurance claim with Cincinnati Insurance Company for approximately $93,000 shortly thereafter. Cincinnati Insurance eventually issued two checks to Christian: $15,420 to replace three "quite expensive" doors and a separate check for $36,331.96, representing the replacement cost of the stolen items.

**{¶ 7}** About one month after the reported burglary, Christian retrieved the "stolen" items from Adams and Jones.

**{¶ 8}** After the burglary, Christian began to plan another staged crime at Cena Restaurant at the Dayton Mall, with Adams's help; Christian owned Cena. In order to make it appear that someone was out to get her, Christian staged a shooting at her home. On the night of December 4, 2009, she called the sheriff's department to report that someone had shot at her in the driveway of her home. Two deputies responded, but they found no shell casings, damage to the home, or other evidence of a shooting, and Christian was uninjured. Christian contacted Adams that same night to discuss the problem of the deputies' not finding any evidence; she asked Adams to "come back." The next day, on December 5, Christian called the sheriff's department to report that she found bullet holes in her garage and spent casings nearby, where the deputies had looked the previous night. Two days later, Christian reported receiving a threatening phone call from a "restricted" number that alluded to the shooting and to making her "pay."

**{¶ 9}** Meanwhile, Christian had talked with Adams and Jones about "blowing

up" her restaurant at the Dayton Mall. She offered to pay Adams and Jones $5,000 for the job. She informed them that she would turn off the security camera, gave them a key to the restaurant, and gave them advice on avoiding detection by the mall's surveillance. Christian also planned to fire an employee, Christopher Hale, who was about the same size as Adams, so they could frame him for the crime.

{¶ 10} Christian fired Hale by phone on December 22, 2009, allegedly for disrespecting a customer. Hale was the last one to leave and close up the restaurant that night, and he noticed that the key to the back door was missing. He called Christian to tell her about the missing key, and she told him not to worry about it because she was on her way to the restaurant. Hale waited approximately half an hour, but when Christian still had not arrived, he left.

{¶ 11} Detective Brad Daugherty, who was investigating the burglary and the shooting at Christian's home, stopped by Christian's house on December 24, 2009. Christian was not at home, but her son, Julian, let Detective Daugherty into the home. Detective Daugherty observed and "made a mental note" of "several items inside the home that were similar to those that had been reported stolen."

{¶ 12} On the night of December 24, Christian told Adams and Jones that the job had to be done that night because bills were coming due very shortly. At approximately 9:00 p.m., the surveillance equipment at the restaurant stopped recording; shortly thereafter, the mall's surveillance equipment documented Christian's departure from the parking lot.

{¶ 13} Adams went to the restaurant that night, but rather than starting a fire according to Christian's plan, he unplugged freezers, cut up furniture, and dumped bottles of

liquor. Christian later complained that Adams had not done enough damage and that she wanted the restaurant blown up.

{¶ 14} On December 26, 2009, the Miami Township police responded to a reported burglary or vandalism at Cena. Officer Tim Beatty observed that there was no sign of forced entry, that furniture had been slashed, that liquor bottles had been opened and dumped but not broken, and that the refrigerators had been unplugged. Christian mentioned Hale as a possible suspect. Officer Beatty proceeded to the mall security office to see whether there was anything of value on the mall's surveillance videos. When he had been gone from the restaurant only twenty to thirty minutes, he received a call regarding a fire at Cena.

{¶ 15} Fire investigators observed a box with burnt receipt books, a burnt phone book, and burnt curtains in the back office of the restaurant. The sprinklers had activated and done significant additional damage to the restaurant. Christian claimed that she had left the restaurant to get coffee, but reported that she had been smoking in the office earlier and could not remember what she had done with her cigarette. Fire personnel closed off the office door with evidence tape before they left the scene, believing at that point that the fire had been accidentally started by Christian's cigarette.

{¶ 16} Fire Lieutenant Thomas Fahrney returned to the restaurant on December 29, 2009. He found that the evidence tape had been ripped down and the door to the office had been opened. He also noticed that there was damage to the restaurant on the 29th that had not been present on the 26th. He documented additional damage in the bathrooms, serving areas, and bar area.

{¶ 17} Lieutenant Fahrney was again dispatched to Cena on January 5, 2010, to investigate a natural gas leak. When he inspected whether the grill was leaking gas, he found that knobs were broken which had not been broken at his previous visits. On January 12, while responding to another natural gas leak, Lieutenant Fahrney observed that a gas burner had been turned on with no flame.

{¶ 18} Erie Insurance insured the Cena restaurant. Its investigator, Mike Miller, as well as some contractors hired to restore the property, also noticed that the damage to the restaurant was becoming more extensive from one visit to the next. By January 5, damage was noted in almost every room, including the restrooms. The repair estimates of the contractors increased by over $80,000 during the week following the initial vandalism and fire. A fire investigator determined that the fire was caused by a "human act" with an open flame, likely a match or a lighter. After an extensive investigation, Erie Insurance denied Christian's claim with respect to the restaurant.

{¶ 19} After Detective Daugherty learned that Cena had been vandalized, he contacted Miami Township Police Department Detective Todd Comer, who was assigned to that case. Detective Comer told Detective Daugherty that a confidential informant had informed him (Comer) that Christian staged the Cena vandalism with Adams's help. Thereafter, the detectives met with Adams and Jones (who had been arrested on unrelated charges), and Adams's son, Darryl Adams, Jr. (who was in the county jail).[1]

{¶ 20} Based on these conversations and Detective Daugherty's observation of

---

[1] Darryl Adams and his son, Darryl Adams Jr., are discussed in this case. We will refer to the senior Adams as "Adams," and to his son as "Adams Jr."

possibly stolen property at Christian's house on December 24, Daugherty prepared an affidavit in support of a search warrant for Christian's home. The warrant was obtained on January 19 and executed on January 20, 2010. During the search, deputies seized a variety of items, including the computers at Christian's home. Forensic investigation of these computers confirmed that Christian and her son had possessed the computers prior to the burglary, i.e., that they were the same computers that Christian had reported stolen in October 2009.

### *Procedural History*

**{¶ 21}** In March 2011, Christian was indicted as follows: Count One, insurance fraud (related to her home), in an amount greater than or equal to $5,000 but less than $100,000; Count Two, insurance fraud (related to the restaurant), in an amount greater than $100,000; Count Three, making false alarm (related to the burglary at her home), resulting in economic harm of more than $5,000 but less than $100,000; and Count Four, making false alarm (related to the vandalism and fire at the restaurant), with economic harm of $500 or more but less than $5,000. In June 2011, an additional count of engaging in a pattern of corrupt activity (Count Five) was added by a separate indictment. Christian filed a motion to suppress evidence, which was overruled following a hearing. The matter was tried to a jury over several days in May 2012. The jury found Christian guilty on all counts.

**{¶ 22}** The trial court sentenced Christian to 18 months and 36 months, respectively, on counts one and two of insurance fraud; it sentenced her to 18 and 12 months, respectively, on counts three and four, making false alarms. The court sentenced Christian to nine years on the count of engaging in a pattern of corrupt activity. The court

ordered that counts one through four were to be served consecutively to each other but concurrently with count five, for an aggregate term of nine years. The trial court ordered Christian to pay restitution as follows: $51,751.96 to Cincinnati Insurance, $21,485.29 to Erie Insurance; $8,647.33 to the Montgomery County Sheriff's Department; and $2,748.77 to the Miami Township Fire Department. The court also ordered Christian to pay court costs and to forfeit her house, due to its use in her offense of engaging in a pattern of corrupt activity. It informed Christian that she would be subject to postrelease control for five years on Count Five and that she may be subject to postrelease control for three years on all of the other offenses.

{¶ 23} Christian appeals from her conviction, raising eleven assignments of error. We will address the fourth assignment out of order, at the end of our opinion.

*H.B. 86*

{¶ 24} Before we begin our discussion of the assignments of error, we will briefly address a change in the law attributable to H.B. 86, which was enacted while this case was pending, and which has implications on several of the offenses charged.

{¶ 25} H.B. 86, which was effective after Christian was indicted but before she was sentenced, made changes to the manner in which the degrees of certain criminal offenses are to be determined. Of relevance here, it changed the dollar amounts that correlate to various degrees of the offenses of insurance fraud and making a false alarm. The following chart sets forth the changes:

**Insurance Fraud, R.C. 2913.47**
**(based on the amount of the claim that is false or deceptive)**

| Degree | Threshold Amount before H.B. 86 | Threshold Amount after H.B. 86 |
|--------|--------------------------------|-------------------------------|
| F3 | $100,000 or more | $150,000 or more |
| F4 | $5,000 or more but less than $100,000 | $7,500 or more but less than $150,000 |
| F5 | $500 or more but less than $5,000 | $1,000 or more but less than $7,500 |
| M1 | Less than $500 | Less than $1,000 |

**Making False Alarms**, **R.C. 2917.32 (based on Economic Harm Caused)**

| Degree | Threshold Amount before H.B. 86 | Threshold Amount after H.B. 86 |
|--------|--------------------------------|-------------------------------|
| F3 | $100,000 or more | $150,000 or more |
| F4 | $5,000 or more but less than $100,000 | $7,500 or more but less than $150,000 |
| F5 | $500 or more but less than $5,000 | $1,000 or more but less than $7,500 |
| M1 | Less than $500 | Less than $1,000 |

{¶ 26} Christian contends that these changes affect the degree of the offenses charged in Count Two (insurance fraud) and Counts Three and Four (making false alarm). Christian also argues that, by lowering the degrees of the offenses of which she was convicted, the application of H.B. 86 affects her conviction of engaging in a pattern of corrupt activity; engaging in a pattern of corrupt activity is a felony of the first degree if the highest underlying offense is a felony of the third degree, but it is a felony of the second degree if the highest underlying offense is a felony of the fourth degree. R.C.

2923.32(B)(1).

{¶ 27} In February 2014, the Supreme Court decided *State v. Taylor*, 138 Ohio St.3d 197, 2014-Ohio-460, 5 N.E.3d 612. Applying R.C. 1.58(B), the supreme court recognized that, where the penalty or punishment for an offense is reduced by amendment of a statute, the reduced penalty or punishment shall be imposed in pending cases. Further, it held that amendments to the penalty for an offense cannot be divorced from a decrease in the classification or degree of an offense. Thus, where appropriate, Christian will be entitled to the benefit of the changes enacted by H.B. 86. We will discuss these issues in more detail under the assignments of error.

{¶ 28} Christian's first assignment of error states:

**I.      The Trial Court Erred in Overruling Appellant's Motion to Suppress.**

{¶ 29} Christian contends that the information contained in the affidavit supporting the application for a search warrant for her home was insufficient to support the issuance of the warrant. Specifically, she claims that information allegedly obtained from an informant was not sufficiently specific in that the affidavit did not state the basis of the informant's knowledge or why the detectives believed the informant; she also claims that the detectives failed to corroborate the information provided by the "anonymous" source. She also claims that the affidavit omitted exculpatory information or was "deliberately incomplete." Additionally, Christian argues that the detectives' reliance on the magistrate's issuance of the search warrant was not objectively reasonable and thus was not a "good faith" reliance.

{¶ 30} "In determining the sufficiency of probable cause in an affidavit submitted

in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting from and following *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see also State v. Leibold*, 2d Dist. Montgomery No. 25124, 2013-Ohio-1371, ¶ 22-23.

{¶ 31} The Ohio Supreme Court also observed in *George* that:

In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*George* at paragraph two of the syllabus.

{¶ 32} In ruling on motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). Accordingly, when we review suppression decisions, "we are bound to accept the trial

court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 33} The affidavit in support of the search warrant for Christian's home at 6855 Saint Laurent Circle in Washington Township was sworn to by Detective Daugherty of the Special Investigations Unit of the Montgomery County Sheriff's Department.

{¶ 34} In his affidavit, Daugherty recounted that, in October 2009, deputies had been dispatched to Christian's home on report of a burglary; Christian reported to Deputy Noel Meyers that numerous items had been taken from the residence, totaling between $50,000 and $100,000. An extensive list of stolen items was compiled, including designer purses, televisions and computers, jewelry, and currency from several countries. Contacts with several local pawn shops failed to turn up any of the stolen property.

{¶ 35} Daugherty further stated that on December 4, 2009, deputies were again dispatched to Christian's home on a report of shots fired; Christian reported that she had been shot at on her driveway by an unknown person as she walked toward her front door. The next day, detectives located bullet holes, "bullet projectiles," and shell casings in the garage and driveway. A few days after the shooting, a "frantic" Christian called Daugherty to report that she had received a call on her cell phone from an unknown person and restricted number stating, "I see you're alright," "you know who this is," and "you will pay and you ripped my heart out." The call was placed from a "Trac Phone" and could not be traced; the detectives' calls to the number went unanswered.

{¶ 36} On December 24, 2009, Detective Daugherty stopped by Christian's

home to speak with her; Christian was not home, but her son, Julian, let Daugherty into the house. During his conversation with Julian, Daugherty noticed that several items that matched the descriptions of items stolen from the house during the October burglary were present, including an iMac computer, X-box, a large flat-screen television, and a "Mac" television. Daugherty "wasn't sure if these items may have been repurchased by Christian."

{¶ 37}   On December 26, 2009, Miami Township police officers responded to a report of breaking and entering at the Cena Restaurant on Miamisburg-Centerville Road, which was owned by Christian. Although there were no signs of forced entry, the restaurant had been "broken into and severely damaged." Shortly after the investigating officers left, "a fire alarm went off at the restaurant and it was on fire." According to Daugherty's affidavit, "[t]he fire was started by the owner of the restaurant Eva Christian who was carelessly smoking and allegedly accidentally started the fire with a cigarette. The restaurant received more damage due to the sprinkler system going off." There were several surveillance cameras at the restaurant, but they were not working at the time of these incidents. Christian told detectives that several employees had keys to the restaurant; she also mentioned that she had fired an employee, Christopher Hale, in the previous days.

{¶ 38}   On January 11, 2010, a "confidential informant" contacted Detective Comer about the breaking and entering at the Cena Restaurant. The informant stated that Christian had hired Darryl Adams to break into the restaurant and damage it; the informant provided Adams's address and other (unspecified) information to identify him. The informant also stated that Christian had hired Adams to break into and fire shots at her home. Although the Cena incident had been "much publicized" in the news, details about

the burglary and shooting at Christian's house had not been publicized; Daugherty noted this distinction in his affidavit.

{¶ 39} On January 12, several detectives talked with Adams, who, when shown a photograph of Christian, admitted knowing her by the name of "Jill"; he did not know her by the name Eva Christian. Adams denied any involvement in the crimes, but stated that he had done some painting work for Christian in November 2009 and had fixed her broken door after the burglary. Daugherty's affidavit described Adams as "not very cooperative." Adams's wife, Diane Jones, also told detectives that she knew the woman in the photograph as "Jill" and that Adams had worked for "Jill." Jones stated that "Jill" had been to their home and had taken Adams out for drinks to discuss other jobs. Jones claimed to have no knowledge of "Jill" paying Adams to commit any crimes.

{¶ 40} When detectives subsequently questioned Christian about Adams, she acknowledged knowing him and stated that he had painted her fence prior to the burglary at her home. Christian said that Adams had never been inside her home or vehicle, that she had never been to his home, and that they had never gone out for drinks to discuss other jobs. Christian became very angry when Daugherty confronted her with information that she had hired Adams to burglarize her home and restaurant, and she ended the interview.

{¶ 41} The affidavit further stated that Detectives Daugherty and Comer went to the Montgomery County Jail to interview Adams's son, Darryl Adams Jr., who had lived with his father in the fall of 2009. Adams Jr. stated that his father had told him that "Jill" paid him (Adams) $1,000 to burglarize her residence and steal computers and televisions, and that a big flat-screen television had been in the living room of Adams's home in October

2009. Adams Jr. denied seeing any other items that had allegedly been stolen from "Jill," but he reported that all of the items taken from her had been returned to her about a month after the burglary. Adams Jr. also stated that he was with Diane Jones on one occasion when Jones received $500 from "Jill" in the parking lot of a post office. Adams Jr. told the detectives that he did not know anything about a shooting.

{¶ 42} Adams Jr. also told the detectives that "Jill" wanted Adams to break into the Cena Restaurant and "blow it up." "Jill" offered to pay several thousand dollars. Adams did not want to blow up the restaurant because other restaurants were attached to it, so he was "supposed to damage the restaurant" instead. Afterward, "Jill" had complained to Adams that there was not enough damage.

{¶ 43} In a second, separate interview at the Montgomery County Jail, Jones (Adams's wife) told detectives that "Jill" had hired Adams to burglarize and steal electronics from her residence; the stolen items were then placed in a storage unit for about a month, when they were returned to "Jill." Jones stated that "Jill" begged Adams to "blow up her restaurant" by the Dayton Mall and that "Jill" left the restaurant unlocked for several nights while she was trying to get Adams to damage it. Jones stated she knew nothing about the shooting at Christian's residence.

{¶ 44} The search warrant indicated that the detectives were looking for the following types of items in connection with investigations into falsification, insurance fraud, complicity, and improper discharge of a firearm: several televisions and computers, jewelry, designer purses, financial records related to Christian and her restaurant businesses, paper documents about a storage unit, insurance documents for the home or Cena restaurant,

firearms or ammunition, cell phone records, and any information pertaining to Adams, Jones, or Adams Jr.

**{¶ 45}** Detective Daugherty's affidavit indicated that the request for a search warrant was based not only on the information from the confidential informant, but also on the statements of two close relatives of Adams (Jones and Adams Jr.) that he had been involved with the burglary at Christian's home and the vandalism at her restaurant. Moreover, the confidential informant had information about the burglary and shooting that had not been released to the public. The informant's statements about Adams's involvement were corroborated by Adams Jr. and Jones, who stated that Adams had engaged in the burglary and restaurant break-in for money.

**{¶ 46}** Based on the information in the affidavit, the magistrate could have made a practical and common sense determination that there was a fair probability that contraband would be found at Christian's home and that the issuance of a search warrant was justified.

**{¶ 47}** Having concluded that there was a reasonable basis for the issuance of the search warrant, we need not address Christian's argument that the detectives could not have relied on the warrant in good faith.

**{¶ 48}** The first assignment of error is overruled.

**{¶ 49}** The second assignment of error states:

**II.     The Trial Court Erred in Overruling Appellant's Rule 29 Motion as to Counts Two, Three, and Five of the Indictment.**

**{¶ 50}** Christian contends that her Crim.R. 29 motion for a judgment of acquittal should have been granted on Counts Two, Three, and Five.

**{¶ 51}** When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a claim based on the sufficiency of the evidence. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing the trial court's denial of a Crim.R. 29(A) motion at the close of the State's case, we consider only the evidence then available to the trial court. *State v. Stoner,* 2d Dist. Clark No. 2008 CA 83, 2009-Ohio-2073, ¶ 24.

**{¶ 52}** When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

### *Count Two - Insurance Fraud in an amount greater than $100,000*

**{¶ 53}** With respect to Count Two, insurance fraud in an amount equal to or greater than $100,000, Christian claims that, although there was evidence that she had hired others to damage her restaurant, there was no evidence she had any reason to know the value of the damage they would do or had ever represented to the insurance company the amount of that damage. She also asserts that she did not stand to benefit from the alleged fraud, because her business was in bankruptcy proceedings, and either the bankruptcy trustee or her

creditors would have received the proceeds of her alleged fraud.

{¶ 54} As noted above, R.C. 2913.47, which defines insurance fraud, was amended by H.B. 86 in 2011, while this case was pending, such that the amounts of the fraudulent claim associated with the various degrees of the offense increased. Under the revised version of the statute, the predicate amount for a felony of the third degree (the degree of the offense charged in Count 2) had increased from $100,000 to $150,000; the predicate amount for a felony of the fourth degree was $7,500 or more but less than $150,000. As we have stated, Christian was entitled to be sentenced under the amended statute because her sentence was "not already imposed" when the amendment took effect. R.C. 1.58.

{¶ 55} The State's evidence, if believed by the jury, established that Christian had hired Adams to "blow up" her restaurant and that she had complained that his initial undertaking of unplugging refrigerators, dumping liquor, and slashing furniture had not accomplished the amount of damage she had intended. The jury also heard evidence from two contractors hired to repair the damage to Cena and the Erie Insurance adjuster who hired them. Each of these individuals had visited the restaurant to assess its damage multiple times between December 26, 2009 and January 5, 2010. With each subsequent visit, they observed additional damage to the premises. By their January visits, the men testified and documented damage including the following: many slashed couches and chairs, smashed toilets, metal dividers of toilet stalls torn from the walls, slashed artwork hanging on the walls, chunks out of and scratches in the wood on the bar, cabinets, and door frames, chipped counter tops, cut wires, and broken glass in the soft drink machine. The sprinkler

system had also activated in the restaurant office, where a fire had occurred, and the power panel in the office was "waterlogged."

{¶ 56} The estimates for the repair of the restaurant exceeded $100,000 but, by the State's admission, they did not exceed $150,000. The State acknowledges that the maximum amount supported by the evidence was $136,709.70. The jury's verdict and finding with respect to the amount (based on the pre-H.B. 86 indictment) indicated its finding that Christian had committed insurance fraud of more than $100,000, but there was no evidence or finding that the amount exceeded $150,000. Under these circumstances, Christian's conviction of insurance fraud was supported by sufficient evidence, but the degree of the offense of which she was convicted was not. Christian should have been found guilty of a felony of the fourth degree.

{¶ 57} The fact that Christian was in bankruptcy proceedings and/or that her creditors might have claimed the insurance proceeds, and thus that she may not have directly profited in the full amount of the fraudulent insurance claim, had no bearing on whether she had committed insurance fraud.

{¶ 58} Christian's argument that she did not *know* the amount of damage Adams would cause will be discussed in more detail under her fifth assignment of error.

### *Count Three - Making False Alarm of Burglary at her home*

{¶ 59} With respect to Count Three, making false alarm related to the burglary at her home, Christian contends that the State's evidence did not substantiate that the costs related to her offense – as opposed to the police conduct in pursuing additional forensic investigation, search warrants, the investigation of incidents at her restaurant, etc... –

supported the degree of the offense of which she was convicted. She claims that "the amount of money spent to execute the search warrant of [her] home, and * * * associated with examining [her] computers, should not have been included in that total cost figure associated with either of [her] charges for making false alarms" because many facets of the investigation "were executed solely at the behest of local police agencies."

{¶ 60} In Count Three, Christian was indicted for making false alarm in violation of R.C. 2917.32(A)(3), which prohibits reporting to any law enforcement agency an alleged offense or other incident within its concern, knowing that such offense did not occur. The degree of the offense of making false alarm is tied to the "economic harm" resulting therefrom. R.C. 2917.32(C). As discussed above, the revised statute applicable at Christian's sentencing provides that the degree of the offense is a felony of the fourth degree if the economic harm was $7,500 or more but less than $150,000, and a felony of the fifth degree if the economic harm was $1,000 or more but less than $7,500; if the economic harm was less than $1,000, the offense is a misdemeanor of the first degree.

{¶ 61} "Economic harm" consists of "[a]ll costs incurred by the state or any political subdivision *as a result of, or in making any response to,* the criminal conduct that constituted the violation * * *, including, but not limited to, all costs so incurred by any law enforcement officers, firefighters, rescue personnel, or emergency medical services personnel of the state or the political subdivision." (Emphasis added.) R.C. 2917.32(E); R.C. 2917.31(E)(1)(b).

{¶ 62} With respect to Count Three, the State alleged that Christian caused economic harm of $8,647.33 to the Montgomery County Sheriff's Department.

**{¶ 63}** Detective Daugherty testified that the Sheriff's Department spent $2,767.33 itself and paid an additional $4,880 to the crime lab for "computer examination." He presented Exhibit 371 to substantiate the department's expenses.

**{¶ 64}** Based on Exhibit 371, less than $100 of the sheriff's department's expenses was attributable to October 11, 2009, the day Christian made her report of a burglary, when a deputy and an evidence technician responded to Christian's home. Two days later, "detective investigation" accounted for another $29.27.

**{¶ 65}** More than six weeks passed before any additional expenses were incurred; these related to the alleged shooting at the home, to which two deputies and an evidence technician responded over two days (December 4 and 5, 2009), at a total cost of $175.62. The telephone "harassment" was investigated on December 10, at a cost of $146.35. Thereafter, the expenses listed on Exhibit 371 include detective interviews with several individuals, preparation and execution of the search warrant for Christian's residence, a search of Adams and Jones's residence, the filing of charges, grand jury testimony, transportation of Adams to the grand jury, and the payment to the crime lab.

**{¶ 66}** The State argued in the trial court – and argues on appeal – that all expenses related to the investigation of the alleged burglary at Christian's home and those related to the subsequent investigation of the making false alarm charge itself were properly included in calculating the "economic harm" caused by Christian's false alarm. However, these costs fell within the definition of "economic harm" only if they were "incurred * * * as a result of, or in making any response to, the criminal conduct that constituted" making false alarm.

{¶ 67} The language of R.C. 2917.31(E)(1)(b) does not support the conclusion that the legislature intended to include in the definition of "economic harm" any and all investigative costs that might arise from crimes discovered as a result of the law enforcement response to a false alarm. If the legislature had intended such an interpretation of economic harm, it would have defined economic harm more broadly. Under the definition provided, one cannot reasonably view all of the costs associated with investigating the fabricated burglary, shooting, and suspected insurance fraud as being "incurred * * * as a result of, or in making any response to" the conduct that constituted making false alarm. It was error to characterize all of the funds expended in the investigation of the separate crimes of insurance fraud and burglary, the shooting, and the alleged telephone harassment as "economic harm" which was "a result of" making false alarm.

{¶ 68} The costs incurred in responding to the false alarm for the burglary of Christian's home were the deputy's and evidence technician's response on the night of the report and the "detective's investigation" two days later. According to Exhibit 371, these costs totaled only $117.08. Even assuming, for the sake of argument, that the expenses related to investigating the shooting and the telephone harassment were also properly included – because there were no separate charges of making false alarms for these incidents and because the detectives might have initially believed that these incidents could be related to the burglary – the additional expenses related to the response to the shooting and the investigation of the telephone harassment totaled $351.24. The costs of detective interviews with people other than Christian, preparation and execution of the search warrant, and forensic investigation into Christian's computers were not properly included as

economic harm incurred as "a result of" making false alarm. Thus, even an expansive view of the economic harm associated with Christian's making false alarm for the burglary was less than the $1,000 threshold needed to elevate it from a misdemeanor of the first degree to a felony of the fifth degree, let alone the $7,500 needed for the fourth degree felony of which she was convicted.

{¶ 69} The economic harm reasonably attributable to Count Three was less than $1,000. The evidence was sufficient to support Christian's conviction for making false alarm, a misdemeanor of the first degree; it did not support a conviction for a felony of the fourth degree.

### Count Five - Engaging in a Pattern of Corrupt Activity

{¶ 70} Christian contends that there was insufficient evidence to convict her of engaging in a pattern of corrupt activity (Count Five).

{¶ 71} Engaging in a pattern of corrupt activity is proscribed by R.C. 2923.32(A)(1), the Ohio RICO Act, which states:

No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

{¶ 72} An "enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. "Enterprise" includes illicit as well as licit enterprises. R.C. 2923.31(C).

{¶ 73} Christian contends that the State offered no evidence of an "enterprise."

Although she acknowledges that she, Adams, and Jones may have been "acting cooperatively when committing these crimes," she asserts that there was no evidence of an "ongoing organization" or that they were "functioning as a 'continuing unit.'" In other words, because her only association with Adams and Jones was for the planning of these crimes, with no function separate and apart from this criminal activity, she claims that no "enterprise" was established as contemplated by R.C. 2923.32(A)(1).

{¶ 74} We have relied on the Federal RICO Act, 18 U.S.C. 1962, and cases interpreting it, in interpreting R.C. 2923.32. In so doing, we have concluded that, in order to establish the "enterprise" discussed in the definition of engaging in a pattern of corrupt activity, there must be some evidence of "(1) an ongoing organization, formal or informal; (2) with associates that function as a continuing unit; and (3) with a structure separate and apart, or distinct, from the pattern of corrupt activity." *State v. Beverly*, 2d Dist. Clark No. 2011 CA 64, 2013-Ohio-1365, ¶ 26, citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed. 2d 246 (1981);[2] *State v. Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, ¶ 91, citing *Turkette*. In *Beverly*, we further observed:

> Expanding upon its holding in *Turkette*, the United State[s] Supreme
>
> Court in *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d
>
> 1265 (2009) * * * "reiterated its holding in *Turkette* that 'the existence of an
>
> enterprise is a separate element that must be proved.' *Id.* [at 2244.] The
>
> Court stressed, as it had in *Turkette*, that 'the existence of an enterprise is an

---

[2] *Beverly* has been accepted for review by the Supreme Court of Ohio on this point of law. *State v. Beverly*, 137 Ohio St.3d 1414, 2013-Ohio-5096, 998 N.E.2d 512.

element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other.'" *Id*. at 2245, quoting *Turkette*, 452 U.S. at 583. * * *

*Beverly* at ¶ 28-29.

**{¶ 75}** In *Beverly*, Beverly and another man were accused of a series of thefts and burglaries in and around Clark County in 2010 and 2011. The evidence established that they were acting in concert in committing the crimes, but there was no evidence in the record that they were involved in "any type of ongoing organization, functioning as a continuing unit, with a structure separate and apart from the pattern of corrupt activity." *Id*. at ¶ 31. "At best, the evidence establishe[d] that Beverly and [the other man]'s actions were disorganized and chaotic in the commission of the burglaries and thefts." *Id*. The men simply "engaged in [a] crime spree" together, which led, in that case, to charges against Beverly for eight counts of burglary, two counts of attempted burglary, five counts of receiving stolen property, two counts of fleeing and eluding, one count of engaging in a pattern of corrupt activity, and one count of having weapons under disability. *Id.* at ¶ 1, ¶ 31. A significant number of victims was involved. *Id*. at ¶ 55. Based on the disorganized and chaotic nature of the offenses, we concluded that Beverly's conviction for engaging in a pattern of corrupt activity – specifically, the jury's finding that Beverly had engaged in an "enterprise" – was not supported by sufficient evidence.

**{¶ 76}** Similarly, in this case, there is no evidence that the "structure" of the activities in which Christian engaged with Adams and, to a lesser extent, Jones, went beyond the crimes of staged burglary and vandalism. The evidence against Christian established that she hired

Adams to remove items from her home (later to be returned to her), to discharge a firearm to misdirect the investigation, and to damage her restaurant, all to allow her to engage in insurance fraud. There was one additional interaction in which Adams was hired to paint at Christian's home to create a seemingly legitimate "front" for their relationship before the burglary was committed. It appears that Adams and Jones were willing to undertake a variety of tasks for Christian to obtain money to support their drug habits; on each occasion, they quickly spent the money Christian paid them for that purpose.

{¶ 77} Christian's relationship with Adams and Jones served no other purpose than to aid her in staging crimes on which she would later base false insurance claims. Their "organization" had a purpose, but it did not function as a continuing unit and its structure was not separate or distinct from the corrupt activity in which they engaged. The "structure" of their efforts simply did not go beyond Christian's efforts to stage crimes to defraud her insurance companies. If Christian and Adams had approached other, unrelated individuals or businesses with the same criminal scheme for committing insurance fraud, perhaps there would have been sufficient evidence to find that they were functioning with a structure separate and apart from Christian's own fraud, but no such evidence was presented.

{¶ 78} The requirement that the organization be separate and apart is highlighted by *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603, which held that a pattern of engaging in corrupt activity "must include both a relationship and continuous activity, as well as proof of the existence of an enterprise. Thus, the conduct required to commit a RICO violation is independent of the conduct required to commit the underlying predicate offenses." (Citations omitted.) *Id.* at ¶ 13. Because the statute's purpose is to

impose cumulative liability for the criminal enterprise, the predicate offenses do not merge with a conviction for engaging in a pattern of corrupt activity, and a court may impose an additional penalty for that offense, i.e., the sanction is for the distinct organizational entity and its "independent" conduct. *Id*. at ¶ 14. The concurring opinion emphasized that Ohio's RICO statute is an offense of dissimilar import from the underlying predicate offenses. *Id*. at ¶ 21, ¶ 26 (Lanzinger, J., concurring). The predicate offenses involve specific statutory criminal violations while the RICO statute was promulgated to "deal with the unlawful activities of those engaged in organized crime." *Id*. at ¶ 24.

**{¶ 79}** There was insufficient evidence from which the jury could have reasonably concluded that Christian engaged in a pattern of corrupt activity, as that offense is defined in R.C. 2923.32 and relevant case law. The trial court erred in denying Christian's motion for a judgment of acquittal on Count 5, engaging in a pattern of corrupt activity. Accordingly, any error in the degree of that offense, as alleged by Christian, is moot.

**{¶ 80}** The second assignment of error is sustained in part and overruled in part. On Counts Two and Three, the evidence was sufficient to support convictions for insurance fraud and making false alarm, but not the degrees of the offenses of which Christian was convicted; her convictions must be modified to reflect the lesser degrees on which conviction was appropriate. On Count Five, there was insufficient evidence of an "enterprise" to sustain the conviction for engaging in a pattern of corrupt activity; that conviction must be reversed.

**{¶ 81}** The third assignment of error states:

**III.** **The Trial Court Erred in Failing to Properly Instruct the Jury as**

**to the Complete Definition of What Constitutes an Enterprise.**

**{¶ 82}** Christian contends that the trial court's jury instruction of the term "enterprise," as used in the definition of engaging in a pattern of corrupt activity, was inadequate, because it contained only the statutory definition and prior cases from this district require a more expansive definition.

**{¶ 83}** Our finding under the second assignment of error that Christian's conviction for engaging in a pattern of corrupt activity, and the implicit finding therein of an "enterprise," were supported by insufficient evidence renders moot any error in the jury instruction on the definition of an enterprise. We note, however, that the trial court gave a lengthy instruction on the element of "enterprise," which went beyond the statutory definition and encompassed the elements of enterprise set forth in *Turkette* and *Boyle*, as discussed under the second assignment of error.

**{¶ 84}** The third assignment of error is overruled.

**{¶ 85}** The fifth assignment of error states:

**V.     The Trial Court's Instructions to the Jury Were Constitutionally Deficient in That They Do Not Convey That the Knowing Mental State for Each Crime Applies to All Elements of Each Offense.**

**{¶ 86}** Christian argues that, with respect to several of the offenses, the trial court did not thoroughly instruct the jury that "the knowing mental state applied to all elements of the offense." Christian contends that she did not know her actions in Count Two, insurance fraud, exceeded the $100,000 threshold previously required for a felony of the third degree. She also asserts that, with respect to both of the making false alarm offenses, the "dollar

figures for each felony threshold were not met" unless the jury included expenditures that were attributable to "law enforcement's own independent investigation." She contends that the trial court did not make clear to the jury that she had to have known her actions would reach the financial thresholds and that, but for the "constitutionally deficient jury instructions," the outcome of the case would have been different.

{¶ 87}   In response, the State contends that the amount of an insurance fraud claim and the economic harm incurred as a result of making false alarm are not elements of the respective offenses, but special findings that enhance the penalty.  It also points out that Christian failed to object to the instructions that were given, and thus that any error must be reviewed for plain error.

{¶ 88}   As we have discussed, the statutes defining insurance fraud and making false alarm base the degree of the offense on the amount of the insurance claim or economic harm at issue in the offense.  In both instances, the offense is a misdemeanor of the first degree unless the amount involved is sufficient to elevate it to a felony of the fifth, fourth, or third degree.  R.C. 2913.47(C) and R.C. 2917.32(C).  In this case, the jury was required to determine whether the amount of the insurance fraud and of the economic harm justified the degree of the offense charged.  However, the monetary value of a fraudulent insurance claim and the economic harm caused by making false alarm are not elements of the crimes; thus, the requisite mens rea does not apply to these factors.  The monetary value relates only to the degree of penalty to be imposed for the offense.  *See State v. Smith*, 121 Ohio St.3d 409, 2009-Ohio-787, 905 N.E.2d 151, ¶ 7.

{¶ 89}   *Smith* found that a jury's "special findings" related to the value of property

stolen in a theft offense were "not part of the definition of the crime"; these findings only affected the punishment available upon conviction, by determining the degree of the offense. The court compared a jury's finding regarding the amount of a theft to a case in which a jury must determine, by a special finding, whether one who operates a motor vehicle so as to elude or flee a police officer has done so in a manner that "caused a substantial risk of serious physical harm to persons or property." *Id*. at ¶ 8. The court characterized the jury's special finding as "purely a question of fact concerning the consequences flowing from the defendant's failure to comply. * * * It is analogous to determining whether the offense occurred in daylight or in darkness or whether the place where it occurred was dusty or wet. It is simply a finding of the presence or absence of a condition." *Id*. at ¶ 12.

**{¶ 90}** The holding in *Smith* is applicable to the facts in our case, where the jury's finding as to the amount involved in each offense related only to the punishment; the question of whether Christian acted knowingly was not part of this determination. The trial court did not err in failing to instruct the jury that Christian had to know that the amount of insurance fraud and of economic harm caused by making false alarms would exceed the amounts alleged in the indictment.

**{¶ 91}** To the extent that Christian repeats her argument that the cost of the entire police investigation cannot be imputed to her as a cost of "making a false alarm," we rely on our discussion under the second assignment of error.

**{¶ 92}** The fifth assignment of error is overruled.

**{¶ 93}** The sixth assignment of error states:

**VI.     The Trial Court Erred in its Determination That the Defendant's**

**Answer to a Question on Cross Examination Was Non-responsive**

**to the Question. The Trial Court Further Erred in its Chosen**

**Method of Repair.**

**{¶ 94}**  Christian contends that the trial court erred in striking a portion of her testimony related to Christopher Hale's prior convictions.  The trial court found that Christian's statement was non-responsive to the question presented and was prejudicial to the State.

**{¶ 95}**  The testimony of one of Christian's accomplices suggested that Hale and Adams were of similar build, and that in firing Hale, Christian was setting him up to be blamed for the vandalism.  Christian was questioned by the prosecutor about having fired Hale on December 22, just before the vandalism of the restaurant.  Christian stated that she did not order Hale out of the restaurant immediately upon firing him because she was afraid of him.  The prosecutor asked whether Christian had ever reported to the police that she "thought he [Hale] might've done the [earlier] shooting with you"; in response, Christian said, "I reported to the police that he had a criminal conviction for attempted manslaughter."  The State immediately objected to this response.

**{¶ 96}**  At sidebar, the court asked the State if it wanted a mistrial, which the court was willing to grant; a conversation ensued about Hale's record, defense counsel's attempt to avoid this subject at trial by asking the prosecutors before trial about the timing of Hale's prior convictions, and how the jury should be instructed if the trial were to proceed.  The judge indicated that she was aggravated and, when the proceedings  resumed in open court, the judge asked that Christian "please listen to the questions" and refrain from

"volunteer[ing] information beyond the question," which gets her (Christian) "into a little bit of a problem." (The court had stricken other answers from Christian that were unresponsive to the questions asked.) The court also instructed the jury "that Mr. Hale had never been charged, convicted, or in any way associated with an involuntary manslaughter[3] and that's just not part of this case."

**{¶ 97}** Christian claims to have truthfully believed that Hale had a conviction for attempted manslaughter, although, in fact, his prior convictions were for felonious assault and robbery. In her brief, she describes the inaccuracy in her statement about the actual offense(s) of which Hale had been convicted as "not different functionally, as far as subjective fear goes;" whatever the prior conviction, Christian claims that it made her fearful of Hale. However, defense counsel did not seek to bring this out on direct or redirect.

**{¶ 98}** Christian characterizes her response to the prosecutor's question as "perfectly responsive" and proper and suggests that the prosecutor should not have asked a question about what Christian had told the police if the prosecutor was not prepared for the response. She claims that the trial court improperly "cleaned up the prosecutor's mess" when it struck her response to the prosecutor's question for "no legal reason." She asserts that the proper remedy would have been for the prosecutor to introduce evidence in rebuttal to show that Hale did not have a conviction for attempted manslaughter.

**{¶ 99}** The record demonstrates that Christian's answer was not responsive to the State's question. The prosecutor asked if Christian had reported any suspicions she had

---

[3] Christian's initial statement about Hale's criminal record indicated that he had committed attempted manslaughter; the trial court's corrective instruction referenced involuntary manslaughter. At the sidebar, the parties discussed Hale's actual convictions, which were for robbery and felonious assault in 1999, over ten years earlier.

about Hale's involvement in the shooting at her house to the police. The question solicited a "yes" or "no" answer. But Christian stated that she had "reported to the police that [Hale] had a criminal record for attempted manslaughter."

{¶ 100} The court shall exercise reasonable control over the mode of interrogating witnesses. Evid.R. 611(A). A trial court also acts within its discretion in granting or denying a motion for a mistrial (although neither side requested a mistrial) and by giving a curative instruction instead of declaring a mistrial. *State v. Davis*, 2d Dist. Clark No. 08CA0117, 2010-Ohio-5279, ¶ 40; *State v. Muncy*, 4th Dist. Scioto No. 11CA3434, 2012-Ohio-4563, ¶12. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶ 101} The trial court accurately informed the jurors that Hale had not been convicted of attempted manslaughter, as stated by Christian. Because Christian's statement about Hale's record was non-responsive to the question presented to her, the trial court did not abuse its discretion by the manner in which it handled Christian's non-responsive answer.

{¶ 102} Christian also failed to demonstrate that she was prejudiced by the court's handling of this matter. Her beliefs that the prosecutor should not have asked "questions she didn't already know the answer to," in detriment to the State's case, and her assertion that the trial court should not have "cleaned up the prosecutor's mess for her" are not supported by the record.

{¶ 103} The sixth assignment of error is overruled.

{¶ 104}     The seventh assignment of error states:

**VII.   The Trial Court Erred in its Orders of Restitution and Forfeiture.**

{¶ 105}     Christian argues that each of the restitution awards was flawed in one or more respects.  Christian claims that governmental agencies are not "victims" of criminal offenses, and thus cannot be the recipients of restitution.  She also asserts that an insurance company cannot be paid restitution because the insurance fraud statute does not provide for reimbursement and that, even if such an award were appropriate, it would have to take into account "other pending or realized civil judgments * * * for the same amount." The State responds that Christian failed to object in the trial court, as required, and presented no evidence of other civil judgments.

{¶ 106}     R.C. 2929.18 governs the imposition of financial sanctions and authorizes a trial court to impose such sanctions, including:

(1) Restitution by the offender to the *victim* of the offender's crime or any survivor of the victim, in an amount based on the *victim's economic loss*. * * * If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense.  If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor

disputes the amount. All restitution payments shall be credited against any recovery of economic loss in a civil action brought by the victim or any survivor of the victim against the offender. (Emphasis added.)

{¶ 107} R.C. 2929.18 does not define "victim." R.C. 2930.01(H)(1) is useful in understanding the legislature's intent, although it is not explicitly controlling for matters other than those in Chapter 2930. *See State v. Ritchie*, 174 Ohio App.3d 582, 2007-Ohio-6577, 883 N.E.2d 1092, ¶ 23 (5th Dist.). For example, R.C. 2931.12(C)(2) provides that an explanation of "economic loss suffered by the victim as a result of th[e] crime" and an opinion from the victim "regarding the extent to which, if any, the victim needs restitution for harm caused by the defendant * * *" may be included in a statement made by the victim.

{¶ 108} Under R.C. 2930.01(H)(1) ("Definitions"), "victim" means a "person who is identified as the victim of a crime or specified delinquent act in a police report or in a complaint, indictment, or information that charges the commission of a crime and that provides the basis for the criminal prosecution or delinquency proceeding and subsequent proceedings * * *." Black's Law Dictionary defines "victim" as the "person who is the object of a crime or tort, as the victim of a robbery is the person robbed." *Black's Law Dictionary* 1567 (6th Ed.1990). *See also State v. Johnson*, 2d Dist. Montgomery No. 24288, 2012-Ohio-1230, ¶ 10.

{¶ 109} "Economic loss" is defined in R.C. 2929.01(L) as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any loss of income due to lost time at work because of any injury

caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense. 'Economic loss' does not include non-economic loss or any punitive or exemplary damages."

{¶ 110} Generally, we review a trial court's order of restitution under an abuse of discretion standard. *Johnson* at ¶ 11; *State v. Naylor*, 2d Dist. Montgomery No. 24098, 2011-Ohio-960, ¶ 22. However, when a trial court determines to whom restitution can be awarded, we review its decision de novo. *Johnson* at ¶ 11.

{¶ 111} The State bears the burden of establishing the restitution amount. *State v. Granderson*, 177 Ohio App.3d 424, 2008-Ohio-3757, 894 N.E.2d 1290 (5th Dist.). The defendant has the burden of establishing offsets to restitution. *See Jontony v. Colegrove*, 2012-Ohio-5846, 984 N.E.2d 368, ¶ 50 (8th Dist.); *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.*, 73 Ohio St.3d 260, 270, 652 N.E.2d 952 (1995). The determination of the amount of loss may be based on an amount recommended by the victim, a presentence investigation, or other sources. R.C. 2929.18(A)(1).

### *Insurance Companies as the Recipients of Restitution*

{¶ 112} We have held that insurance companies, banks, and other institutions are not proper *third-party* payees of restitution, because they are not "victims" under R.C. 2929.18(A)(1). *See, e.g., State v. Colon*, 185 Ohio App.3d 671, 675, 2010-Ohio-492, 925 N.E.2d 212 (2d Dist.) (homeowner's insurer was not a "victim" of aggravated arson for purposes of restitution, although it paid for repairs to the victim's home); *State v. Kiser,* 2d Dist. Montgomery No. 24419, 2011-Ohio-5551 (bank that reimbursed its customer for charges to a stolen credit card was not a victim entitled to

restitution). However, these cases do not hold that an insurance company or other institution cannot itself be the victim of a crime in different circumstances, such as in the case of insurance fraud. *State v. Hinson*, 8th Dist. Cuyahoga No. 87132, 2006-Ohio-3831, ¶ 53 (stating that, where an insurance company was "not merely a third party seeking reimbursement for its payment * * *, but it was also a victim of the insurance fraud," it was entitled to restitution).

*Cincinnati Insurance Company*

{¶ 113}        Cincinnati Insurance insured Christian's home. The trial court ordered that Christian pay restitution to Cincinnati Insurance for economic loss in the amount of $51,751.96, an amount representing the total it paid to her in two checks: $36,331.96 for the lost contents of the house (calculated based on full replacement cost less depreciation) and $15,420 to replace the doors.

{¶ 114}        Christian asserts that the insurance fraud statute, R.C. 2913.47, has no provision permitting an insurer to obtain reimbursement for investigating insurance fraud. But this argument has no bearing on the restitution award to Cincinnati Insurance. No portion of that award was attributable to the company's investigation of the alleged fraud; it represented the amount actually paid on Christian's fraudulent claims.

{¶ 115}        Christian also contends that the restitution order to Cincinnati Insurance did "not take into account other pending or realized civil judgments against [Christian] for the same amount." (R.C. 2929.18(A)(1) provides for such a credit against amounts recovered in a civil action.) In the presentence investigation, the victim impact statement for Cincinnati Insurance contained the following statement with respect to

economic loss: "None-Any monies owed to the Cincinnati Insurance Company are pending in a civil suit filed against Ms. Christian." However, the presentence investigation also contained an email sent to the prosecutor by Cincinnati Insurance's attorney, which stated that "the evidence pertaining to restitution would simply be the checks paid" by the company, which were already in the record and about which an employee of Cincinnati Insurance, Jeff Feustal, testified at trial.

{¶ 116}     Cincinnati Insurance established through testimony and exhibits the amount it had paid on Christian's fraudulent insurance claim. Although the presentence investigation alluded to civil litigation, Christian did not present any evidence that civil litigation had resulted in payment to Cincinnati Insurance or was pending at the time of sentencing. She also did not object to the order of restitution to Cincinnati Insurance on the basis of civil litigation when it was imposed. Under these circumstances, we cannot conclude that the trial court erred or abused its discretion in awarding restitution to Cincinnati Insurance.

*Erie Insurance Company*

{¶ 117}     Erie Insurance, which insured Christian's restaurant, was awarded $21,485.29 in restitution for its economic loss. Erie did not pay on Christian's insurance claim, but it did expend substantial funds investigating her claim. Christian claims that she "cannot glean from the record what possible basis there was for this restitution award" and contends that no evidence was presented at trial that Erie "had been defrauded and paid out on a false insurance claim." The State contends that Erie was entitled to recover the money it expended investigating Christian's false claim, although it did not pay the claim, and that

the restitution award was based on the cost of its investigation.

{¶ 118}     Christian correctly observes that Erie did not pay on her fraudulent insurance claim, meaning that it did not reimburse her for the damage to her restaurant or any other damage, such as lost income, that might have been covered under her policy (as Cincinnati Insurance did).   She also correctly observes that the insurance fraud statute itself does not provide for reimbursement to an insurance company for an investigation into insurance fraud.   Nonetheless, as we stated above, an insurance company itself may be the victim of fraud and thus may be entitled to restitution under R.C. 2929.18 for its economic loss.

{¶ 119}     The State presented evidence that Erie had expended a substantial sum in its investigation of Christian's fraudulent claim.   Michael Miller, a property specialist with Erie who was assigned to the Cena claim, met with Christian and others at the restaurant on at least two occasions.   During the first visit on December 29, Fire Lieutenant Fahrney informed Miller that there was more damage to the restaurant on December 29 than there had been on December 26, when Christian first reported the incident.   When Miller returned to the restaurant a second time on January 5 to go over his estimate, he noticed extensive additional damage.   Miller had taken pictures during his first visit and was able to document many of these changes.   Because the incident seemed suspicious, Erie brought in an additional investigator and hired an attorney to "do an examination [of Christian] under oath."   Based on Miller's and the investigator's observations, Christian's examination under oath, information from the police and fire departments, and estimates from contractors who had visited the site on multiple occasions, Erie decided to deny the claim.

{¶ 120} Miller testified that, immediately after the incidents at the restaurant, Erie had paid approximately $1,500 for restoration work and hired a separate company to inventory the contents of the restaurant; no money was paid directly to Christian. An email from Miller was attached to the presentence investigation; it provided exact figures of $1,601.12 paid to contractors for temporary repairs to the restaurant and $19,882.17 for "attorney and expert" investigation of the claim. These numbers total $21,485.29, which was the amount of restitution awarded by the trial court. No evidence was presented about, and no amount was awarded for, the amount paid for the inventory of the restaurant.

{¶ 121} Erie was the victim of the insurance fraud, as it was the insurer of the restaurant, and Christian sought reimbursement from Erie for the damage that she (or someone she hired) had caused. The trial court reasonably concluded that the costs incurred by Erie in the investigation of Christian's fraudulent insurance claim were an "economic loss suffered by the victim as a direct and proximate result of the commission of the offense," and it reasonably credited Miller's testimony as to the amount expended by Erie in its investigation of Christian's insurance fraud. The court did not hold a hearing on restitution, but Christian did not ask it to do so, as she was entitled to do. R.C. 2929.18(A)(1). The trial court did not abuse its discretion in awarding restitution to Erie.

### Police and Fire Departments as the Recipients of Restitution

*Montgomery County Sheriff's Office & Miami Township Fire Department*

{¶ 122} The Montgomery County Sheriff's Department was awarded $8,647.33 in restitution for its economic loss, and the Miami Township Fire Department was awarded $2,748.77 for its economic loss.

{¶ 123} Christian states that governmental agencies are not "victims"

entitled to restitution when they expend public funds "in the pursuit of fighting crime." Alternatively, she argues that, even if some amount of restitution were warranted, the restitution award far exceeded the scope of her alleged illegal conduct in making false alarm, and that the costs of the investigation undertaken by the Sheriff's Department's own initiative, such as the search warrants and investigation of her computers, should not have been included in the restitution award.

{¶ 124} The State contends that the language of the making false alarms statute, R.C. 2917.32, "supports" awards of restitution for governmental entities for economic harm caused by making false alarm, and that the amount was substantiated in the testimony of Detectives Daugherty and Comer and documents that were admitted at trial.

{¶ 125} R.C. 2917.32, making false alarm, does not explicitly provide for restitution; it defines the degree of the offense based on the amount of "economic harm." "Economic loss," for which restitution is permissible, is defined separately and differently from "economic harm." The amounts may or may not be the same in a given case, but there is an important distinction in the definitions: restitution can only compensate a "victim" for "economic loss," whereas "economic harm" (which relates to the degree of the offense) can include "[a]ll costs incurred by the state or any political subdivision as a result of, or in making any response to, the criminal conduct that constituted the violation * * *, including, but not limited to, all costs so incurred by any law enforcement officers, firefighters, rescue personnel, or emergency medical services personnel of the state or the political subdivision." Thus, we begin our analysis by addressing whether the sheriff's department was a "victim" of any "economic loss," as these terms are used in R.C. 2929.01(L) and R.C. 2929.18.

{¶ 126}        Ohio courts have addressed the question whether a governmental agency that responds to a false alarm or otherwise expends its funds in the investigation of a crime is a "victim" of the offense.   Several districts have held that a governmental agency's expenditure of its own funds to pursue a drug buy is not one the scenarios contemplated by the restitution statute.   *State v. Williams*, 6th Dist. Sandusky No. S-13-007, 2013-Ohio-4838, ¶ 8, citing *State v. Samuels*, 4th Dist. Washington No. 03CA8, 2003-Ohio-6106, ¶ 5; *see also State v. Pietrangelo*, 11th Dist. Lake No. 2003-L-125, 2005-Ohio-1686, ¶ 15.   Likewise, courts have held that a law enforcement agency is not entitled to restitution for its payment of "wages" to an informant or for costs associated with extradition.[4]   *State v. Jones*, 7th Dist. Jefferson Nos. 08JE20, 08JE29, 2010-Ohio-2704, ¶ 44; *State v. Toler*, 174 Ohio App.3d 335, 2007-Ohio-6967, 882 N.E.2d 28, ¶ 12 (3d Dist.); *see also State v. Wolf*, 176 Ohio App.3d 165, 2008-Ohio-1483, 891 N.E.2d 358 (3d Dist.) (holding that fire departments are not victims of arson and cannot seek restitution for firefighting); *State v. Ham*, 3d Dist. Wyandott No. 16-09-01, 2009-Ohio-3822, ¶ 48-49 (finding that a court cannot order restitution to a humane society for costs associated with caring for a defendant's dog).   With certain exceptions, such as embezzlement of public funds or vandalism or destruction of governmental property, governmental agencies have not been found to constitute "victims" entitled to restitution for their efforts to fight crime using public funds.   *Ham* at ¶ 48; *Toler* at ¶ 11; *Pietrangelo* at ¶ 15-16.

{¶ 127}        Except where specific statutory authority exists, the majority of

_____

[4] R.C. 2949.14 separately provides for the collection of extradition costs from felony offenders, through payment to the clerk of courts, if certain procedures are followed.

courts in other states, considering this issue under their own restitution statutes, "'have likewise concluded that the government is not a victim entitled to restitution where public moneys are expended in pursuit of solving crimes, as these expenditures represent normal operating costs.'" *Pietrangelo* at ¶ 17 (Citations to cases from seven other states omitted). In addition to not being a "victim," some courts reasoned that a law enforcement agency does not suffer "economic loss" when the responding officers were on "regular, scheduled duty," and their salaries and benefits were an expense that the department would have been required to pay regardless of the defendant's false alarm. *See California v. Hanson*, 2004 WL 182791,* 4 (Cal.App. 1 Dist.) (Jan. 30, 2004) ("If investigation triggered by a crime were enough, the [law enforcement agency] would be a direct victim of every crime within its jurisdiction, regardless of the nature of the crime."); *Montana v. Brothers*, 371 Mont. 254, 307 P.2d 306, ¶ 12 (2013) (holding that a governmental agency can be a "victim" under the state's restitution statute "only when that entity suffers property damages in the commission of a crime, or incurs costs in the investigation or apprehension of an escaped person."); *Edsall v. Indiana*, 983 N.E.2d 200, 209-210 (Ind.App.2013) (holding that a restitution award encompassing money spent by a drug task force to investigate the defendant, including money for controlled buys and wages for law enforcement, was improper because the State was not a victim as contemplated by the restitution statute).

{¶ 128} We appreciate the State's argument and the trial court's conclusion that a governmental agency that expends funds and/or other resources in responding to a false alarm should be reimbursed somehow for its expenditure of resources. However, the legislature has not provided for restitution in such circumstances, and we are bound to apply

the restitution statute – particularly its use of the term "victim" – as it is written. Without specific expression of such an intent, we cannot conclude that the legislature intended to make law enforcement or other governmental agencies, whose only involvement in the reported crime is their response to it in their official capacities, eligible for restitution. We agree with the Eleventh District in *Pietrangelo*: "Although we acknowledge the State's legitimate interest and entitlement, in certain cases, to defray the spiraling costs of criminal investigation on behalf of the taxpayer, * * * absent an express statement from the legislature authorizing the trial courts to sentence criminal defendants to pay restitution to law enforcement agencies for this purpose, we should not, as an appellate court, take it upon ourselves to judicially rewrite the statute." *Pietrangelo* at ¶ 17.

{¶ 129} The "imposition of a sentence not authorized by statute constitutes plain error." *State v. Rohda*, 135 Ohio App.3d 21, 25, 732 N.E.2d 1018, 1020 (3d Dist.1999); *see also State v. Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372, ¶ 24 (2d Dist.); *Jones*, 7th Dist. Jefferson Nos. 08JE20, 08JE29, 2010-Ohio-2704, ¶ 40; *Samuels*, 4th Dist. Washington No. 03CA8, 2003-Ohio-6106, ¶ 9. Although Christian did not object to the restitution order in favor of the Montgomery County Sheriff's Department or the Miami Township Fire Department in the trial court, we find plain error in that these awards were not authorized by law.[5]

---

[5] The State acknowledged in its brief that some of the restitution awarded to the Miami Township Fire Department was based on expenses incurred by the Miami Township Police Department, rather than the fire department, and that the court's judgment should be modified to include the police department. Any such error is irrelevant because of our conclusion that neither the law enforcement agency nor the fire department was entitled to restitution.

{¶ 130}       Christian also argues that, even if the sheriff's department were entitled to restitution, the amount awarded in this case far exceeded the amount that could be directly attributed to her making false alarm.   We addressed this argument under the second assignment of error.   More importantly, any question as to the proper amount of restitution to the Montgomery County Sheriff's Department or the Miami Township Fire Department is moot in light of our holding that, under the facts of this case, they were not "victims" entitled to restitution.

### Ability to pay

{¶ 131}       In addition to her objections to the awards of restitution, Christian claims that the court did not consider her ability to pay restitution, which it was required to do under R.C. 2929.19(B)(6).   Christian argues that the court was required to consider her current and future ability to pay and that it "appears not to have considered [her] education and potential for future employment (if any)."

{¶ 132}       "R.C. 2929.19(B)(5) imposes a duty upon the trial court to consider the offender's present or future ability to pay before imposing any financial sanctions under R.C. 2929.18.   The statute does not require the trial court to consider any specific factors when determining the offender's present or future ability to pay financial sanctions.   Nor does the statute require a hearing on the matter.   The court is also not required to expressly state that it considered a defendant's ability to pay * * *.   The record should, however, contain evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution.   The trial court may comply with this obligation by considering a presentence-investigation report, which includes information about the defendant's age, health, education, and work history. The court's consideration * * * may be inferred from the record

under appropriate circumstances." (Citations and internal quotations omitted.) *State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 52.

{¶ 133} The evidence and the record show that, while awaiting trial, Christian operated the Boulevard Haus, a restaurant she owned in the Oregon District of Dayton. She filed numerous requests for release from, or privileges under, her electronic home detention to allow her to be actively involved with restaurant operations. In a statement contained in the presentence investigation, Christian stated that she earned "approximately $50,000 per year as a restaurant owner." The presentence investigation also stated that Christian was 44 years old and "considered herself to be in fine physical shape." She was released on bond while she awaited trial and hired a private attorney to represent her. There was evidence in the record to support the trial court's conclusion that Christian had the ability to pay restitution, and it did not abuse its discretion in ordering her to do so.

*Forfeiture*

{¶ 134} Finally, Christian contends that forfeiture of her home was not authorized in this case pursuant to the Ohio RICO statute because the home was not "derived from, or realized through" conduct that constituted engaging in a pattern of corrupt activity. She asserts that the use of the house was incidental to the crimes she committed. Further, she contends that her indictment failed to allege that her real estate was subject to forfeiture and that no verdict was returned on this question, as required by *State v. Bowshier*, 2d Dist. Clark No. 2937, 1993 WL 81813 (Mar 18, 1993). The State concedes that the forfeiture proceedings in this case did not comply with R.C. 2981.04, but it argues that Christian waived this argument because she did not

object to the forfeiture on these grounds in the trial court,[6] and thus did not give the trial court an opportunity to consider and/or correct its procedures.

{¶ 135}     In order for the sentence to include criminal forfeiture, the defendants must be given notice in the indictment that the state is seeking forfeiture.  R.C. 2923.32(B)(4); *State v. Hall*, 8th Dist. Cuyahoga No. 92952, 2010-Ohio-1665, ¶ 9; *Bowshier* at *3.  Criminal forfeiture may be permitted only after a conviction of R.C. 2923.32.  Moreover, forfeiture requires a special verdict describing the extent of the interest or property subject to forfeiture. R.C. 2923.32(B)(4); *Hall* at ¶ 9.  These provisions provide property owners affected adversely by government action the right of notice and an opportunity to be heard.  *Hall* at ¶ 9.

{¶ 136}     The State admits that Christian did not receive notice in the indictment that the State sought the forfeiture of her home and that the jury did not make the special finding required for such forfeiture.  Although we are unpersuaded by the State's argument that Christian waived these requirements by failing to object to the forfeiture in the trial court, we need not address this issue, having already concluded that Christian's conviction for engaging in a pattern of corrupt activity was not supported by the evidence.

{¶ 137}     The seventh assignment of error is overruled with respect to Christian's argument that Cincinnati Insurance and Erie were not entitled to collect restitution, that the amounts awarded to them were not supported by the record, and/or that she did not have the ability to pay restitution.  The assignment is sustained with respect to Christian's arguments that she was not properly ordered to pay restitution to governmental agencies providing law

---

[6] In the trial court, Christian objected on the basis that the claims of the "secure mortgage holder" and the IRS would supercede any forfeiture proceedings.

enforcement and fire services, and that the trial court erred in ordering that her house be forfeited.

{¶ 138}     The eighth assignment of error states:

**VIII.   The Trial Court Abused its Discretion in Sentencing.**

{¶ 139}     As discussed above, H.B. 86 passed after Christian was indicted but before she was sentenced, and it made changes to the manner in which the degrees of some offenses, including the ones with which Christian was charged, were to be determined. Specifically, it changed the dollar amounts that correlate to various degrees of the offense of insurance fraud and making false alarm.   Christian contends that she should have been convicted of lesser degrees of the offenses charged in Count Two (insurance fraud) and Counts Three and Four (making false alarm).   She points out that the application of H.B. 86 to the conviction for insurance fraud in Count Two would also affect her conviction for engaging in a pattern of corrupt activity, which is a felony of the first degree if the highest underlying offense is a felony of the third degree, but is a felony of the second degree if the highest underlying offense is a felony of the fourth degree.   R.C. 2923.32(B)(1).

{¶ 140}     The State argues that Christian did not object to the degrees of the offenses at trial and has demonstrated no plain error.   It further contends that Christian's convictions for making false alarm were unaffected by the change, because the economic harm under Count Three ($8,647.33) constituted a felony of the fourth degree under both versions of R.C. 2917.32, and because the economic harm under Count Four ($2,748.77), constituted a felony of the fifth degree under either version of the statute.   *See, e.g., State v. Trammell*, 2013-Ohio-4615, 3 N.E.3d 260 (2d Dist.) and *State v. Morgan*, 2d Dist. Montgomery No. 25023,

2013-Ohio-122 (each involving economic harm in excess of the threshold amount for the degree of the offense charged, regardless of the applicability of H.B. 86).

{¶ 141} With respect to the insurance fraud charged in Count Two, the State acknowledges that, at most, the evidence established damages to the restaurant for repair and clean up of $136,709.70, an amount of economic harm that constituted a felony of the fourth degree, rather than of the third degree, under the post-H.B. 86 definition of the offense. (At the time of the indictment, it constituted a felony of the third degree.) The State asserts that, "under R.C. 1.58(B), an offender who is sentenced after [the effective date of H.B. 86] for an offense committed before that date can count on receiving a *sentence* associated with the amended felony level, but courts do not have the authority to reclassify the crime from one of a higher degree to one of a lesser degree." (Emphasis sic.)

{¶ 142} The State acknowledges that it has raised this argument in several prior cases before this court, and we have rejected it, reasoning that a defendant sentenced after the effective date of H.B. 86 is entitled not only to any reduced sentence, but also to any reduction in the degree of the offense. *See, e.g., State v. Arnold*, 2012-Ohio-5786, 984 N.E.2d 364 (2d Dist.); *State v. Wilson*, 2d Dist. Montgomery No. 25057, 2012-Ohio-5912; *State v. Anderson*, 2d Dist. Montgomery No. 25114, 2013-Ohio-295; *State v. Jenkins*, 2d Dist. Montgomery No. 25414, 2013-Ohio-3038. The State's brief also acknowledges that the Supreme Court accepted this issue for review in *State v. Taylor*, Case No. 2012-2136, a case from the Ninth Appellate District certifying that its decision in *Taylor*, 9th Dist. Summit No. 26279, 2012-Ohio-5403 was in conflict with judgments of the Fifth Appellate District on this issue. In *Taylor,* the Ninth District had applied H.B. 86 in such a way that Taylor was convicted of a felony under the

pre-H.B. 86 definition of the offense, but was sentenced as a misdemeanant due to the enactment of H.B. 86 while the case was pending. The State argues for a similar result here, where Christian would be convicted of a felony of the third degree, but sentenced under the provisions for a felony of the fourth degree.

{¶ 143} In February 2014, subsequent to briefing in our case, the Supreme Court decided *Taylor*, 138 Ohio St.3d 194, 2014-Ohio-460, 5 N.E.3d 612. Applying R.C. 1.58(B), it held that amendments to the penalty for an offense may not be divorced from a decrease in the classification or degree of an offense in the manner advocated by the State. "Judges have no inherent power to create sentences. * * * A court has no power to substitute a different sentence for that provided for by statute or one that is either greater or lesser than that provided for by law." *Id*. at ¶ 18, citing *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 22. The supreme court concluded that the legislature had provided no statutory authority for courts to sentence "those convicted of a felony offense * * * pursuant to the sentencing statute for misdemeanants." *Id*. at ¶ 18. Thus, on the authority of *Taylor*, we must conclude that a defendant convicted of a felony of the third degree cannot be sentenced for a felony of the fourth degree.

{¶ 144} Anticipating that we and/or the Supreme Court might reject its argument that the sentence, but not the degree of the offense, was affected by H.B. 86, the State argues that, even if it were error for the trial court to convict Christian of the higher, pre-H.B. 86 degrees of the offenses in Counts Two, Three, Four, and Five, she did not object and it was not *plain* error. Plain error is an error or defect at trial, not brought to the attention of the court, that affects a substantial right of the defendant. Crim.R. 52(B). The standard for plain error is whether the

error is obvious and, but for the error, the outcome of the proceeding clearly would have been otherwise. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108. The State claims that the error was not the type of "obvious" defect necessary to establish plain error because, at the time of Christian's sentencing, this court had not yet decided the effect of H.B. 86, nor had other appellate districts.

{¶ 145}    Christian was sentenced in June 2012, and our earliest decisions on this issue, *Arnold* and *Wilson*, were issued in December of that year. The supreme court did not resolve the conflicts that arose among the districts in 2012 and 2013 until 2014. The State contends that, "[s]ince the effect of H.B. 86 and R.C. 1.58(B) was unknown at the time Christian was sentenced because no appellate court had reached the issue, any error in failing to reduce the degree of Christian's offense was not obvious."

{¶ 146}    In support of its argument, the State cites *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E.2d 1240. *Barnes* addressed a different issue – whether felonious assault with a deadly weapon was a lesser included offense of attempted murder (and what was the effect of an incorrect jury instruction) – that was similarly unresolved at the time of Barnes's trial. The jury was instructed that felonious assault was a lesser included offense of attempted murder; the defendant did not object. The court of appeals concluded that felonious assault with a deadly weapon was not a lesser included offense of attempted murder and reversed the conviction. *State v. Barnes*, 11th Dist. Portage No. 98-P-52 (July 21, 2000).

{¶ 147}    Although the supreme court and court of appeals agreed on the resolution of the legal issue presented, the supreme court held that the court of appeals had erred as a matter of law in reversing the conviction, notwithstanding an erroneous jury instruction on the lesser

included offense.

> [T]he trial court incorrectly instructed the jury that felonious assault with a deadly weapon was a lesser included offense of attempted murder. * * * This error, however, was not "plain" at the time that the trial court committed it. Before today, this court had not decided the question of whether felonious assault with a deadly weapon is a lesser included offense of attempted murder. The Ohio appellate courts were divided on this issue as well. The lack of a definitive pronouncement from this court and the disagreement among the lower courts preclude us from finding plain error. (Citations omitted.)

*Barnes*, 94 Ohio St.3d at 28.

{¶ 148} We disagree with the State's assertion that the timing of the decisions from this court and the supreme court or the holding in *Barnes* compels the conclusion that the trial court's error in convicting Christian of the higher degrees of the offenses did not amount to plain error. R.C. 1.58(B) states that, "[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended." The trial court in this case did not convict Christian of the degrees of the offenses that *Taylor* has held are required by the amendments contained in H.B. 86. In our view, the holding in *Taylor* is not a prospective application of a rule of law, but rather an explanation of what was required by H.B. 86 at the time of Christian's conviction.

{¶ 149} *Barnes* differs from Christian's case in that it involved an evolving standard, set forth in supreme court case law, of how to identify lesser included offenses. There

is no similar ambiguity here as to whether H.B. 86 was intended to apply to sentences not yet imposed at the time of its enactment. Finding that Christian's failure to object to sentencing under pre-H.B. 86 law would a) beg the question (and another appeal) of whether this constituted ineffective assistance of counsel, and b) hold that a court can impose a sentence that is not authorized by law, as long as there is no contemporaneous objection. The trial court's application of the degrees of the offenses other than as required by H.B. 86 was plain error.

{¶ 150}     We note that the United States Supreme Court recently provided some guidance on this issue in *Henderson v. United States*, __ U.S. __, 133 S.Ct. 1121, 185 L.Ed.2d 85 (2013). Interpreting Fed.R.Crim.P. 52(b), the Court held that, if an error qualified for plain error review in that it affected the defendant's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings, *an appellate court must apply the law in effect at the time it renders its decision*, regardless of whether the trial court decision (to which no objection was made) was clearly lawful, was clearly unlawful, or was based on unsettled law.

{¶ 151}     Applying *Taylor*'s holding that a defendant sentenced after the effective date of H.B. 86 must be convicted in accordance with the degrees of offenses reflected in that legislation, we agree with Christian that the trial court erred, in some respects, in the degrees of the offenses of which she was convicted. With respect to the insurance fraud charged in Count Two, where the jury found that the amount of the fraudulent claim was equal to or greater than $100,000, but no evidence was presented that it was equal to or greater than $150,000, the trial court erred in convicting Christian of a felony of the third degree; she should have been convicted of a felony of the fourth degree on this count. With respect to making false alarm as charged in Count Three, the economic harm established by the State that was incurred "as a result of, or in

making any response to" the making false alarm was less than $1,000, and Christian should have been convicted of a misdemeanor of the first degree. There was insufficient evidence to support Christian's conviction on Count Five, engaging in a pattern of corrupt activity, so the degree of this offense is no longer at issue. Each of these matters is discussed in greater detail under the second assignment of error.

{¶ 152} We have not discussed the economic harm established with respect to making false alarm as charged in Count Four, the vandalism at the restaurant. The State presented evidence that the Miami Township police and fire departments spent $2,740.77[7] responding to and investigating the vandalism at Cena. Some of the expenditures included in this total were incurred in the subsequent investigation of insurance fraud, rather than "as a result of, or in making any response to" the making false alarm, and thus suffer from the same infirmity as some expenses claimed with respect to the making false alarm at Christian's home, as discussed under the second assignment of error. However, the economic harm related to the response of police officers and the fire department *on the day of the making false alarm* at Cena, as testified to by Detective Comer and reflected in Exhibit 372, exceeded $1,900. Christian states in her brief that the State "failed to show that the amount of recourses (sic) expended upon count four * * * was $1,000 or more," but she does not challenge the State's figures in any specific respect, except where they related to the subsequent investigation rather than the initial response. Because the State offered evidence that the expenses incurred "as a result of, or in making any response to" the vandalism at the restaurant exceeded $1,900, the trial court did not

---

[7] We note that the evidence presented at trial suggested that the economic harm to the Miami Township police and fire departments was $2,740.77, but the trial court awarded restitution in the amount of $2,748.77. This typographical discrepancy is not pertinent to our discussion.

err in convicting her of making false alarm, a felony of the fifth degree under both pre- and post-H.B. 86 law, on Count Four.

### *Merger of Allied Offenses*

{¶ 153}　　　　　Christian also argues that the trial court failed to merge her convictions for insurance fraud and making false alarm as allied offenses, because "every insurance policy that exists on earth requires thefts or vandalisms to be reported to police before an insurer will even consider paying the claim." She also contends that insurance fraud and making false alarm "served as the predicate acts underlying the RICO conviction" and that the RICO statute, R.C. 2923.32, "necessitates that [Christian's] underlying convictions be merged with her conviction on the RICO count" because they "comprise" the RICO conviction.

{¶ 154}　　　　　The supreme court set out the framework for analyzing potential allied offenses in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 47-51.

Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. [*State v. Blankenship*, 38 Ohio St.3d 116, 119, 526 N.E.2d 816 (1988)] (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if

both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

{¶ 155}      Even assuming, for the sake of argument, that we accept Christian's premises that 1) any claim for insurance involving a burglary or vandalism requires the filing of a police report (a "fact" about which no evidence was presented), and therefore, 2) in order to commit insurance fraud, one must make a false report to the police, we cannot accept her conclusion that the offenses of insurance fraud and making false alarm are allied offenses of similar import. It is not possible to commit the offenses by the same conduct. The "reports" at issue in the offenses are made to different entities for different immediate purposes, although the

ultimate goal of obtaining payment from an insurance policy might be the same. The trial court did not err in failing to merge the related counts of insurance fraud and making false alarm.

{¶ 156} Because we have concluded that Christian's conviction for engaging in a pattern of corrupt activity was supported by insufficient evidence, we need not consider whether the four other offenses of which she was convicted should have merged with that offense.

{¶ 157} The eighth assignment of error is sustained insofar as the trial court erred in convicting Christian of higher degrees of insurance fraud and making false alarm than were permitted following the enactment of H.B. 86. The assignment is overruled with respect to Christian's claims that the offenses of insurance fraud and making false alarm should have been merged.

{¶ 158} The ninth assignment of error states:

**IX.    The Trial Court Erred in Calling Darryl Adams as its Own Witness.**

{¶ 159} Christian contends that there was no "permissible" basis for the trial court to call Darryl Adams as a court's witness under Evid.R. 614(A), and that the trial court erred in doing so.

{¶ 160} In a pretrial motion, the State claimed that Adams had an ongoing relationship with Christian. After listening to numerous phone calls between Adams and Christian while Adams was in jail, the State believed that Adams intended to protect Christian at trial and, in doing so, to protect himself as well, because he had "engaged in criminal activity on her behalf." Based on prosecutors' and detectives' past conversations with Adams, the State asserted that Adams would "likely be guarded in his testimony, due to his loyalties to the defendant, and the implications his testimony has on his involvement in the defendant's crime

spree." The State also stated that Adams had become less cooperative with the State when he was "told he would not receive any consideration with respect to his own pending criminal charges in another county." For these reasons, the State asked that Adams be called as a court's witness, a request to which Christian did not object at trial.

{¶ 161} Christian contends in her brief that Adams "never intended to cooperate with the State." Christian refers to Adams as "the state's puppet" and asserts that the "prime candidate for a court's witness * * * is a victim and an eyewitness who will not otherwise cooperate with the party originally planning to call him – not a would-be codefendant who would otherwise take the Fifth Amendment."

{¶ 162} The court's ruling on the State's motion to call Adams as a court's witness is not on the record. (Prior to his testimony, an "[i]ndiscernible sidebar conference" was "not transcribed.") But the parties do not dispute that he was called in this way, and the manner in which Adams was questioned at trial supports this conclusion.

{¶ 163} Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18. A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, or a victim or witness who will not otherwise cooperate with the party originally planning to call him, is a prime candidate for application of Evid.R. 614(A). *Id.*, citing *State v. Brewer*, 10th Dist. Franklin No. 84AP-852, 1986 WL 2652, *3 (Feb. 25, 1986). "The decision as to whether to call

a witness on its own motion pursuant to Evid.R. 614(A) is within the discretion of the trial court and will be reversed only for an abuse of such discretion." *State v. Marshall*, 9th Dist. Lorain No. 01 CA007773, 2001 WL 1647706, *2 (Dec. 26, 2001), citing *State v. Forehope*, 71 Ohio App.3d 435, 441, 594 N.E.2d 83 (5th Dist.1991). *See also State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 32-34.

{¶ 164} Christian claims that Adams should not have been called as a Court's witness because "[t]here was no change in Adam's (sic) willingness to cooperate with the state – Adams never intended to cooperate with the state." However, Crim.R. 614(A) does not require a change in the witness's willingness to cooperate as a prerequisite to calling a witness as a court's witness; the fact that Adams may have been reluctant to cooperate with the State throughout its investigation and prosecution of the case did not impinge on the State's ability to ask that he be called as a court's witness. "Indeed, a request for designation of a court's witness often arises precisely because the State has anticipated an unfavorable change in the witness's account of previous events. Under such circumstances, the State should not be required 'to take its chances' by calling as a State's witness one whose testimony would be beneficial to the jury but who has a indicated an intent or motive to testify in a way that would be detrimental to the State's case." *Hazel* at ¶ 37, citing *State v. Adams*, 62 Ohio St.2d 151, 158, 404 N.E.2d 144 (1980).

{¶ 165} Here, Adams's role in the crimes was crucial to the State's version of events. The State presented evidence that Adams may have had an ongoing relationship with Christian and that, at the very least, he intended to protect her. It is apparent that, in protecting Christian, Adams furthered his own interest in avoiding prosecution for his involvement in the offenses. Under these circumstances, the trial court did not abuse its discretion in calling Adams

as a court's witness.

{¶ 166}     The ninth assignment of error is overruled.

{¶ 167}     The tenth and eleventh assignments of error state:

**X.     The Trial Court Erred in Failing to Follow the Correct Procedure When Allowing the State to Impeach Appellant with an Audio Tape in the Presence of the Jury.**

**XI.     The Trial Court Erred in Admitting at Trial an Audio Jail Recording of an Alleged Telephone Conversation Between the Defendant and an Inmate.**

{¶ 168}     The tenth and eleventh assignments relate to a recording played during the testimony of Detective Daugherty, when he was recalled to rebut Christian's testimony. The recordings documented conversations between Presley and Christian while Presley was incarcerated in the Montgomery County Jail in late 2010 and early 2011 (after the offenses charged in this case were committed) and were offered to refute Christian's claim that she did not know Jack Presley. Presley was the son of Diane Jones and stepson of Darryl Adams.

{¶ 169}     Christian claims that the State improperly used recordings of telephone conversations to impeach her trial testimony, because the recordings were not authenticated and the "correct procedure for impeachment was not followed." She cites Evid.R. 613(A) and (B)(1), which govern impeachment of a witness; she asserts that her impeachment was improper because she was not given a prior opportunity to explain or deny the statements and her attorney was not informed of the content of the recording. Christian also claims that the recording was not properly authenticated because no evidence was offered that Detective Daugherty could

credibly identify the voices of Christian and Presley.

{¶ 170}     A trial court has broad discretion in the admission and exclusion of evidence, and an appellate court will not reverse the judgment of the trial court unless it clearly abused its discretion and the defendant has been materially prejudiced thereby.  *State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 62, citing *State v. Withers*, 44 Ohio St.2d 53, 55, 337 N.E.2d 780 (1975).

> There are two types of self-contradiction impeachment recognized by Evid.R. 613: prior inconsistent statements and prior inconsistent conduct. Extrinsic evidence of a prior inconsistent statement or prior inconsistent conduct is generally admissible if two conditions are met.  First, if the evidence is offered for the sole purpose of impeaching the witness, the proponent must lay the proper foundation and the witness must have the opportunity to explain or deny the inconsistent behavior or conduct.  Second, the subject matter of the statement must constitute one of the following:
>
> > (a) A fact that is of consequence to the determination of the action other than the credibility of a witness;
> >
> > (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), 616(B) or 706;
> >
> > (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

*Basset v. Apex Intern. Corp.*, 1st Dist. Hamilton No. C-000384, 2001 WL 903460 (Aug. 10,

2001). *See also State v. Noble*, 9th Dist. Lorain No. 04CA8495, 2005-Ohio-600, ¶ 32-33.

{¶ 171} According to Jones's testimony, Christian's initial attempt to enlist Presley's help with Christian's plans to burglarize her (Christian's) house, by sending a letter to Adams's and her (Jones's) residence, led to Christian's affiliation with Adams and Jones. During Christian's testimony, Christian repeatedly denied knowing Jack Presley or ever having communicated with him, but she stated that "somebody called [her] from a jail whose name was Jack, but [she] thought it was somebody who used to work for [her]."

{¶ 172} Detective Daugherty was called to rebut Christian's testimony about her knowledge of and communication with Presley. Detective Daugherty testified that Presley had been in the Montgomery County Jail from November 22, 2010 until October 5, 2011 and that the Montgomery County Jail records all phone calls from inmates, as well as the phone number of the recipient. Daugherty had reviewed Presley's phone records at the jail and testified that Presley had called Christian's phone number eleven times while he was in jail; Christian's phone number was known to Daugherty through phone records and because of Christian's earlier claim of telephone harassment. Daugherty stated that he had heard the voices of Presley and Christian during his involvement in this case. He presented a recording of calls between Presley and Christian between December 2010 and February 20, 2011 (Exhibit 414) and identified their voices on it. The trial court overruled Christian's objection to the foundation laid for and the State's use of Exhibit 414.

{¶ 173} The admission of the recordings from the jail was in accordance with Evid.R. 901(B)(5), governing authentication and identification, because Detective Daugherty testified that he recognized the voices on the recordings and recognized the cellular phone

number to which the call was placed as belonging to Christian. Further, jail records indicated that the caller was Presley. Det. Daugherty laid a proper foundation for the recordings. Further, Christian had an opportunity to explain or deny the conduct; she testified to her belief that her conversations with "Jack" from the jail were with a former employee. Insofar as evidence of these conversations refuted Christian's denial of any relationship or prior communication with Presley, the conduct established a fact of consequence to the action; Christian's relationship with Presley connected her with Adams, who was involved in each of the crimes at her behest. The trial court did not abuse its discretion in allowing the State to use the audio recordings to impeach Christian's testimony.

{¶ 174} The tenth and eleventh assignments of error are overruled.

{¶ 175} The fourth assignment of error states:

**IV.** **Appellant's Convictions Were Entered Against the Manifest Weight of the Evidence.**

{¶ 176} Christian claims that her convictions were against the manifest weight of the evidence in several respects: 1) she did not have "the 'knowing' mental state to the $100,000 threshold" for the insurance fraud alleged in Count Two, 2) the jury "necessarily included massive quantities of impermissible figures" in concluding that her conduct in making a false alarm (Count Three) exceeded $5,000; and 3) there was no evidence to substantiate the "enterprise" element of engaging in a pattern of corrupt activity.

{¶ 177} We have addressed these arguments under other assignments of error. Under the second assignment, we concluded that Christian's conviction for engaging in a pattern of corrupt activity was not supported by sufficient evidence; having concluded that there was

insufficient evidence to support this conviction, no additional discussion of the weight of the evidence is warranted. We also concluded that the trial court erred in including all of the sheriff's department's and township's costs of investigating the burglary and insurance fraud in the "economic loss" upon which the degree of making false alarm was based. And under the fifth assignment, we held that the amount of the claim for insurance fraud was not an element of the offense to which the mens rea applied. Accordingly, Christian's argument related to the weight of the evidence is overruled.

### *Conclusion*

{¶ 178}     The judgment of the trial court will be affirmed in part, as modified, and reversed in part. Christian's conviction for engaging in a pattern of corrupt activity will be reversed, as will the forfeiture of her house ordered in connection with that conviction. The convictions on insurance fraud (Count Two) and making false alarm (Count Three) will be modified: the evidence in support of Count Two supported a conviction for a felony of the fourth degree, rather than of the third degree, and the evidence in support of Count Three supported a conviction for a misdemeanor of the first degree, rather than a felony of the fourth degree. These convictions will be affirmed, as modified. With respect to restitution, the awards to Cincinnati Insurance and Erie Insurance will be affirmed; the awards to the Montgomery County Sheriff's Department and Miami Township Fire Department will be reversed. The matter is remanded for resentencing on Counts Two and Three, and for entry of a judgment consistent with this opinion.

. . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurring and dissenting:

{¶ 179}     I concur in the opinion and resolution of the assignments of error except with regard to the sufficiency of the evidence to support the conviction for engaging in a pattern of corrupt activity as detailed in paragraphs 70 through 79 of the opinion. I believe there was sufficient evidence to support that conviction and dissent to that extent.

{¶ 180}     One reason for a separate offense prohibiting a person from engaging in an enterprise through a pattern of corrupt activity is that the whole is more than the sum of the parts. An offender who participates in a criminal enterprise is different from an offender who commits several or multiple distinct criminal acts. Willingness to construct or participate in such a criminal organization is antithetical to law-abiding citizenry.

{¶ 181}     Here Eva Christian constructed and directed a criminal enterprise. She was the boss. Adams and Jones were the employees. One could hardly expect that they would have a documented table of organization, keep minutes of their meetings, or withhold taxes from employee pay. The two predicate offenses to support the pattern of corrupt activity were the insurance fraud surrounding the staged house burglary and the insurance fraud surrounding the staged restaurant vandalism. But the group members did much more: (1) they planned and staged the burglary for which the employees were to receive $1,000, (2) Christian submitted a fraudulent insurance claim, (3) missing items later were returned, (4) Adams painted Christian's fence to provide cover, (5) they planned and staged a shooting into her home which was also falsely reported, (6) Christian had them return to the house to lodge bullets into her house and to leave bullet casings (which was additionally falsely reported), (7) they planned "blowing up" her restaurant for which the employees were to receive $5,000.00, (8) Christian fired restaurant

employee Christopher Hale to make it appear someone had it in for her, (9) the employees vandalized the restaurant, (10) there was additional damage done to the restaurant after the boss decided the initial damage was not enough, (11) there was the staged fire at the restaurant after the initial police investigation, (12) further damage was done to the restaurant on at least two more occasions, and (13) Christian submitted a fraudulent insurance claim. To me, this evidence was sufficient for the jury to find beyond a reasonable doubt that Christian participated in "the affairs of the enterprise through a pattern of corrupt activity" in violation of R.C. 2923.32(A)(1). I would determine that this evidence was legally sufficient and therefore would affirm the conviction for engaging in a pattern of corrupt activity.

. . . . . . . . . .

Copies mailed to:

Kirsten A. Brandt
Matthew T. Crawford
Brock A. Schoenlein
Hon. Barbara P. Gorman

Case Name: *State of Ohio v. Eva Christian*
Case No.: Montgomery App. No. 25256
Panel: Froelich, Donovan, Hall
Author: Jeffrey E. Froelich
Summary: