[Cite as *State v. Graham*, 2014-Ohio-4250.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                          :          C.A. CASE NO.      25934

v.                                               :          T.C. NO.      13CR1133/1

DAWON H. GRAHAM                                  :          (Criminal appeal from
                                                             Common Pleas Court)

    Defendant-Appellant                         :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____26th____ day of ____September____, 2014.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, Talbott Tower, Suite 1210, 131 N. Ludlow Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}**   Dawon H. Graham was convicted after a jury trial in the Montgomery

County Court of Common Pleas of aggravated burglary, two counts of felonious assault, aggravated robbery, and kidnapping, each with a firearm specification. The trial court merged the felonious assault counts and sentenced Graham to an aggregate term of 18 years in prison. The court ordered Graham to pay $1,500 in restitution to Chad Durant and court costs.

{¶ 2} Graham appeals from his convictions, claiming that his convictions were based on insufficient evidence and were against the manifest weight of the evidence, that his consecutive sentences were not supported by the record, and that the court erred in ordering restitution. For the following reasons, Graham's sentence will be reversed and vacated, and the matter will be remanded for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record and in the judgment entry. In all other respects, the trial court's judgment will be affirmed.

### I. Sufficiency and Manifest Weight of the Evidence

{¶ 3} Graham's first assignment of error states:

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE EVIDENCE PRESENTED WAS INSUFFICIENT, AS A MATTER OF LAW, TO PROVE THE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

{¶ 4} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d

541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 5} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 6} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of

conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 7}   According to the evidence at trial, Zachary Moore sold soft drinks, chips, cigarettes, and candy to neighbors from his residence at 905 Neal Avenue, Apt. 19.   His girlfriend, Rose Durant, who also lived there, sometimes sold daiquiris.

{¶ 8}   On April 9, 2013, a woman that Moore recognized from the neighborhood, but did not know, came to his apartment several times to purchase items.   The woman had not previously bought anything from Moore.   When the woman came in the late evening, she "got smart" with Moore, and he slammed the door in her face.

{¶ 9}   At approximately 2:30 a.m. on April 10, Moore was awakened by loud knocking on the apartment door.   Rose Durant, who was asleep in the bedroom, and her 25-year-old son, Chad Durant, who had fallen asleep watching television in the living room, also awoke.   Moore went to the door and saw the same woman.   After scolding the woman for coming so late, Moore sold her four Milwaukee Best Ice beers.   As Moore gave the woman her change, two men "came off the wall" and barged in, knocking Moore onto his back.   The first man through the door pointed a gun at Moore's face and demanded money.

{¶ 10}   Hearing the commotion at the front door, Chad Durant went toward the door and saw the intruders.   The man with the gun ordered him to lie down, and Chad Durant did so in the living room.   The second man asked Durant for money, but Durant stated that he did not live there and did not have any money.

{¶ 11}   Moore gave $6 to the armed intruder.   The man appeared to be frustrated, and he told his accomplice to "get the bitch."   The accomplice went to the bedroom door

and kicked it in. Rose Durant screamed. To protect his mother, Chad Durant got up and went after the accomplice. The accomplice ran out of the apartment. Chad Durant then tried to "swing on" the armed intruder. The intruder fired three shots at Durant, hitting him in the arm, shoulder, and neck. Durant fell face-first to the floor. The armed intruder and the woman, who apparently had been waiting in the hallway just outside of the apartment, fled. Chad Durant testified that he was 100% certain that he was shot with a revolver.

{¶ 12} Rose Durant described the woman as tall, light-skinned, "not thin," and with braided hair; she wore a faded red or hot pink tank top with spaghetti straps. Moore described her similarly. Chad Durant described the unarmed man as a tall light-skinned black man with "scruffy messy afro-type hair" and wearing a white tank top and black pants. Rose Durant's description of the man's physical features were similar to her son's.

{¶ 13} Chad Durant described the shooter as shorter and darker than his male accomplice, and he indicated that the man wore a black shirt with designs on it and blue jeans. Moore and Durant both testified that the two men wore masks on their faces. They described the gunman's mask as a black, v-shaped cloth that was worn from below the nostrils and covered the mouth and chin. Chad Durant testified that he focused on the shooter's eyes, not his clothing. Moore stated that the shooter also had a blue or black baseball cap.

{¶ 14} Radee Ali, Jr., whose girlfriend lived in the building, testified that he encountered two men in the stairwell just before the shooting. He stated that one man was light-skinned, had an afro, and was wearing a white tank top and blue jeans. The other man had a darker complexion. The men had asked Ali where the apartment was where they

could purchase items; Ali had directed them toward Moore's apartment.

{¶ 15} After the men went down the stairs toward Moore's apartment, Ali heard the men and a woman whispering. He testified: "Sat there. I guess I heard their whole little plot they was supposed to be coming up with, but they didn't actually go by that plot. They were supposed to be going back there. Somebody was supposed to be getting held hostage. They was supposed to be just taking the money. Wasn't nobody supposed to get hit, apparently." Ali stated that he heard knocking, yelling, and tussling, followed by three gunshots and Rose Durant's screaming. Ali went to Moore's apartment, saw Chad Durant bleeding on the floor, and went to call the police.

{¶ 16} Dayton police officers were dispatched at approximately 3:00 a.m. and responded promptly to the call. While at the scene, Officer Joshua Campbell requested a canine unit to possibly track the perpetrators. Montgomery County Deputy Sheriff Darren Harvey and his trained police dog, Bosco, responded at 3:33 a.m. Bosco followed a scent one block west to Salem Avenue and one block north to Five Oaks Avenue. Dayton police officers accompanied Harvey and Bosco.

{¶ 17} As the officers approached 953 Five Oaks Avenue, a woman in a red tank top and capris, later identified as Denise Hayes, came up to them and told them that she saw men running east on Five Oaks. The officers observed a man, later identified as Graham, sitting on the porch of 953 Five Oaks. Graham was bald and was wearing a black t-shirt with a "very distinctive, busy white print on the front of it." The officers ultimately concluded that Graham and Hayes were suspects, and they were taken into custody and driven to the police department. Four Dayton police officers returned to 953 Five Oaks to

try to locate the third suspect; Leangelo Lee, who matched the description of the third suspect, was found sleeping inside the house.

{¶ 18} On April 11, 2013, while he was hospitalized, Chad Durant was shown a photo array. He selected Graham's photograph as the man who had shot him and expressed that he was 95% certain of his selection. At trial, Chad Durant again identified Graham as the shooter, stating that he was 100% certain. Chad Durant also testified at trial that the shirt that Graham had worn when he was arrested was the same shirt that he saw the shooter wearing in the apartment.

{¶ 19} From a photo array, Rose Durant identified Lee as the man who had kicked in her bedroom door. Moore stated at trial that he was unable to identify either of the two men, because they had been wearing masks. However, Moore had selected Hayes's photograph from a photo array.

{¶ 20} The police collected several items during the investigation. Among the items collected were three bullet casings that were recovered from Moore's apartment. Milwaukee Best Ice beer cans were located in the alley that ran along the side of 905 Neal Avenue and up to Five Oaks Avenue; additional cans were found at 953 Five Oaks Avenue. In addition, the police collected from the alley pieces of black cloth that the intruders could have used as masks. DNA was located on the cloth, but none of the DNA matched Graham or Lee. The DNA of one sample was identified as belonging to William Higgins, but Det. Douglas Baker concluded after reviewing information about Higgins (including that Higgins was 61 years old) that it was unlikely that Higgins had participated in these offenses.

{¶ 21} On appeal, Graham claims that there was insufficient evidence that he was

one of the perpetrators and that his convictions were against the manifest weight of the evidence. He states that the evidence concerning the identity of the shooter was based primarily on the eyewitness testimony of Chad Durant, which Graham asserts was "uncertain and unreliable."

{¶ 22} "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. * * * Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." (Citation omitted.) *State v. Tate*, Slip Opinion No. 2014-Ohio-3667, N.E.3d, ¶ 15.

{¶ 23} Viewing the evidence in the light most favorable to the State, we find sufficient evidence to support the jury's conclusion that Graham forced himself into Moore's apartment in the early morning hours of April 10, 2013, and committed the charged offenses. Within an hour of the events at Moore's apartment, the police had obtained descriptions of the perpetrators from multiple individuals; the descriptions were generally consistent with each other. Soon thereafter, the police encountered two individuals – Hayes and Graham – who matched the descriptions of two of the perpetrators. A trained canine had tracked to the location where Hayes and Graham were found (953 Five Oaks), and Lee, who matched the description of the third perpetrator, was later apprehended at the same location. The day after the shooting, Chad Durant selected Graham's photograph from a photo spread and identified Graham as the shooter. Durant reiterated his identification of Graham at trial. Hayes and Lee were identified by Moore and Rose Durant, respectively, as the other two perpetrators. From this evidence, a reasonable jury could have found beyond a reasonable doubt that Graham committed the offenses of which he was convicted.

{¶ 24} Graham claims that additional evidence presented at trial undermines the reliability of Chad Durant's identification of him. Graham notes that Chad Durant was awakened from sleep in the middle of the night and encountered two intruders, one of whom was armed. Chad Durant testified that he saw the armed intruder's partially-masked face for a total of eight seconds; his description of the shooter at trial differed somewhat from the description he initially gave to the police. When presented with a photo array, Chad Durant indicated that he was 95% certain of his identification, whereas he was 100% certain at trial. Chad Durant testified that he was also 100% certain that the shooter had used a revolver (which does not eject bullet casings), but three bullet casings were located in the apartment; while the presence of bullet casings does not preclude a conclusion that a revolver was used (they could have been extracted manually), the facts of the case suggest that the shooter likely had a semiautomatic weapon, which ejects the casings. Finally, the State presented pieces of black cloth, found in the alley, that could have been used as masks by the two men; however, the DNA located on the masks did not come from Lee or Graham, and the State's DNA expert testified that a person wearing the fabric as a facial mask would be expected to leave DNA on it.

{¶ 25} The additional evidence cited by Graham could cast doubt on the reliability of Chad Durant's identification. Chad Durant viewed the shooter for a short period of time, in the presence of a firearm, shortly after being awakened and while a high-stress incident was occurring. The shooter was partially masked. Chad Durant's stated confidence in his identification could have been seen as unrealistic, in light of the fact that he might have been mistaken about the use of a revolver.

{¶ 26} Nevertheless, we do not find that this evidence compels the conclusion that Graham's conviction was against the manifest weight of the evidence, when viewed in light of the totality of the circumstances. It is possible that the black cloth that was discovered in the alleyway was not used in the burglary, and while Graham's DNA was not located on the cloth, the cloth did not contain the DNA of any likely suspect. The cloth does not exonerate Graham; it simply does not inculpate him. As for Chad Durant's identification, the jury could have reasonably determined that it was reliable when viewed in conjunction with his identification of Graham's distinctive shirt as the shirt worn by the perpetrator, Graham's similarity to the descriptions provided of the shooter, Graham's apprehension shortly after the offenses, and his presence with Hayes and Lee, who were identified by Moore and Rose Durant as the other two perpetrators.

{¶ 27} The credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Considering all of the evidence presented at trial, the jury did not lose its way when it determined, from the totality of the evidence, that Graham was the shooter.

{¶ 28} Graham's first assignment of error is overruled.

## II. Consecutive Sentences

{¶ 29} Graham's second assignment of error states:

THE TRIAL COURT IMPOSED UPON APPELLANT A SENTENCE THAT WAS NOT SUPPORTED BY EVIDENCE ON THE RECORD.

{¶ 30} In this assignment of error, Graham states that his aggregate 18-year sentence was unsupported by the record and contrary to law. First, he states that his

sentence was contrary to law because his total sentence of 15 years (plus 3 years for a firearm specification) exceeded the maximum term allowed for the most serious offense, which was 11 years. Second, Graham claims that the trial court imposed consecutive sentences without making the statutory findings required by R.C. 2929.14(C)(4).

{¶ 31} Graham was convicted of aggravated burglary, felonious assault, aggravated robbery, and kidnapping, each with a firearm specification. The felonious assault was a second-degree felony, and the other three offenses were first-degree felonies. The court imposed 11 years in prison for each first-degree felony, to be served concurrently with each other and consecutively to a four-year sentence for the felonious assault. The trial court also ordered Graham to serve three years in prison on the firearm specification, to be served prior to and consecutively to the other sentences. Graham's aggregate sentence was 18 years.

{¶ 32} "A defendant may seek a discretionary appeal of consecutive sentences under R.C. 2953.08(C) if the aggregate prison term exceeds the maximum sentence possible for the most serious offense of which the defendant was convicted." *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 24; *see State v. Myers*, 2d Dist. Clark No. 2001-CA-40, 2002-Ohio-6196, ¶ 6; R.C. 2953.08(C)(1). This grant of the right to appeal does not mean, however, that consecutive sentences are erroneous merely because they exceed the maximum sentence allowed for the most serious offense. *Myers* at ¶ 6. "To the contrary, consecutive sentences for multiple convictions certainly may exceed the maximum sentence for the most serious offense." *Id.*, citing, e.g., *State v. Hacker*, 2d Dist. Clark No. 2001-CA-12, 2001 WL 958873 (Aug. 24, 2001) (expressly rejecting "any suggestion that

consecutive sentences may not exceed the maximum sentence allowable for the most serious offense of which a defendant is convicted"). R.C. 2929.14(C)(6) specifically states that, "[w]hen consecutive prison terms are imposed pursuant to division (C)(1), (2), (3), (4), or (5) or division (H)(1) or (2) of this section, the term to be served is the aggregate of all of the terms so imposed." *Accord Hacker* at \*1.

{¶ 33}    The maximum sentence that Graham faced for the first-degree felonies was 11 years. Graham's aggregate sentence was greater than 11 years, but the aggregate sentence was not contrary to R.C. 2953.08(C) merely because it exceeded the maximum sentence allowable for the first-degree felonies.

{¶ 34}    Graham further claims that the trial court failed to make the necessary findings to impose consecutive sentences.

{¶ 35}    In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, Slip Opinion No. 2014-Ohio-3177, N.E.3d, ¶ 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was

under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 36} In most cases, "[t]he trial court is not required to give reasons explaining these findings, nor is the court required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences." *State v. Temple*, 2d Dist. Clark No. 2012-CA-65, 2013-Ohio-3843, ¶ 21, quoting *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 86. As stated by the supreme court, "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29. In our view, an explanation of the rationale for a sentence (both case-specific and statutory) can only increase the public understanding of a particular sanction and thus the perceived legitimacy of the criminal justice system. *See*, *e.g.*, O'Hear, *Explaining Sentences*, 36 Fla.St.U.L.Rev. 459 (2009); Lamparello, *Social Psychology, Legitimacy, and the Ethical Foundations of Judgment: Importing the Procedural Justice Model to Federal Sentencing*

*Jurisprudence*, 38 Colum.Hum.Rts.L.Rev. 115 (2006).

**{¶ 37}** The trial court must incorporate the statutory findings into its sentencing entry. *Bonnell* at ¶ 30. "A trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Id.*

**{¶ 38}** At sentencing, the trial court reviewed the contents of the presentence report. The court stated:

> The Defendant is 36 years old. The pertinent facts in this case is that the jury has found that the Defendant committed the crimes, which consisted, among other things, of shooting the victim in the neck and I think – I believe in the wrist. We don't know how well that shot was aimed, but if it was aimed, that was an attempt to kill for sure, not – that is for sure.

> The Defendant has been in court before starting as a juvenile in 1994 when he would have been, I guess, that would be 18. There was an abduction, sentenced to the Department of Youth Services and released about five months later. And in October of '94, there was an escape, I presume, from the Department of Youth Services (indiscernible). Then as an adult, I had a disorderly conduct in 2000, a DUI in 2001, and also a resisting arrest where he was sentenced to eight days in jail. In 2003, there was a domestic violence, an assault, and he was sentenced to 30 days in jail, suspend 18. In

2004, a criminal damaging sentence to 90 days in jail, suspend 78. 2005, drug paraphernalia, a $25 fine. 2007, criminal trespassing, sentenced to 30 days in jail, suspend 18. Later in '07, another drug paraphernalia, credit of time served. I don't know how much that was. In Nov – in 2011, he was sentenced to 180 days in jail, suspend 169 on an assault. In '98, there was possession of cocaine. He was granted treatment in lieu of conviction, declared absconder, reinstated to probation, revocation filed, revoked and sentenced to seven in the CRC. In 2001, there was an assault, sentenced to community control, declared absconder, revocation filed, and revoked, sentenced to 12 months. In 2004, there was a burglary and he was sentenced to 12 months. In 2005, there was a weapons under disability, sentenced to one year in Count II and seven months on Count III, concurrent. In 2008, he was convicted of forgery and sentenced to seven months.

So he has been sentenced to, it looks like, prison five prior times. And in at least two of those included absconding. He apparently is addicted to alcohol, according to this report, he uses – drinks 12 beers a day, uses marijuana occasionally, and crack cocaine once a week, so he might be considered addicted to that. * * *

**{¶ 39}** The court imposed sentence on each of the offenses. It imposed the maximum possible prison term, 11 years, for the first-degree felonies and ordered them to be served concurrently. Addressing the felonious assault (deadly weapon) count, the court stated, "That'll be four years. It'll be consecutive to the other charges." The court did not

mention R.C. 2929.14(C)(4) or make any findings using the statutory language.

{¶ 40} Prior to imposing *any* sentence, the trial court is required to consider the purposes and principles of felony sentencing in R.C. 2929.11 and R.C. 2929.12. *Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, at ¶ 38. The overriding purposes of felony sentencing, as set forth in R.C. 2929.11(A), are "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." These purposes must be taken into account when the trial court imposes sentences for each offense, such as when determining whether to impose community control versus a prison sentence or when determining the appropriate prison term for the offense.

{¶ 41} The trial court's summary of Graham's criminal history may reflect the court's general consideration of what sentence was appropriate to "protect the public from future crime or to punish the offender." However, the trial court's statements do not reflect whether it considered those matters for purposes of R.C. 2929.11 or R.C. 2929.14(C)(4). Therefore, it is unclear from the court's summary whether it concluded that Graham's criminal history demonstrated that *consecutive* sentences were necessary to protect the public from future crime by the offender. *See* R.C. 2929.14(C)(4)(c).

{¶ 42} R.C. 2929.14(C)(4) requires the trial court to separately consider the need to protect the public or to punish the offender in the context of whether consecutive sentences can be imposed. Although the trial court is not required to use the exact statutory language set forth in R.C. 2929.14(C)(4), the trial court's statements and findings must reflect the

considerations set out in that statute. A general consideration of the purposes of felony sentencing prior to stating the sentence for each offense, as required by R.C. 2929.11, is not enough. In this case, the trial court's summary of Graham's criminal history did not reflect more than a general consideration under R.C. 2929.11.

{¶ 43} In addition, R.C. 2929.14(C)(4) requires a finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The trial court made no explicit finding as to these factors, and we cannot determine from the court's statements at sentencing that it considered the proportionality of consecutive sentences to the seriousness of Graham's conduct and the danger he posed to the public. As stated in *Bonnell*, "the court's description of Bonnell's criminal record as atrocious and its notation of his lack of respect for society do not permit us to conclude that the trial court had made the mandated statutory findings in accordance with R.C. 2929.14(C)(4)." *Bonnell*, Slip Opinion No. 2014-Ohio-3177, N.E.3d, at ¶ 34.

{¶ 44} Finally, the trial court was required to include the statutory findings under R.C. 2929.14(C)(4) in its judgment entry. *Bonnell* at ¶ 30. Here, the trial court did not incorporate any findings regarding consecutive sentences in its sentencing entry.

{¶ 45} In summary, a trial court must make certain statutory findings under R.C. 2929.14(C)(4) before it can impose consecutive sentences, and an appellate court must be able to find support in the record for those findings. This matter must be remanded to the trial court for further consideration of whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record and in the judgment entry.

{¶ 46}  Graham's second assignment of error is sustained in part and overruled in part.

### III.  Restitution

{¶ 47}  Graham's third assignment of error states:

THE TRIAL COURT ORDERED APPELLANT TO PAY AN AMOUNT OF RESTITUTION WITHOUT CONDUCTING A HEARING AND WITHOUT BASING ITS ORDER ON ANY PROOF OR ANY DOCUMENTATION WHATSOEVER THAT THE AMOUNT ORDERED WAS APPROPRIATE.

{¶ 48}  Graham asserts that the trial court failed to hold a hearing on restitution, even though defense counsel objected to the imposition and amount of restitution on three occasions during sentencing.  Graham further asserts that the trial court erred in ordering restitution in the amount of $1,500 without documentation to support that amount.

{¶ 49}  R.C. 2929.18 governs the imposition of financial sanctions and authorizes a trial court to impose such sanctions, including:

[(A)](1) Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. * * *  If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the

economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount. All restitution payments shall be credited against any recovery of economic loss in a civil action brought by the victim or any survivor of the victim against the offender.

{¶ 50} "Economic loss" is defined in R.C. 2929.01(L) as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any loss of income due to lost time at work because of any injury caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense. 'Economic loss' does not include non-economic loss or any punitive or exemplary damages."

{¶ 51} The State bears the burden of establishing the amount of restitution. *State v. Christian*, 2d Dist. Montgomery No. 25256, 2014-Ohio-2672, ¶ 111. Because R.C. 2929.28(A)(1) gives trial courts broad discretion in awarding restitution, we review the court's restitution order for abuse of discretion. *State v. Dolphin*, 2d Dist. Montgomery No. 25695, 2014-Ohio-3434, ¶ 24.

{¶ 52} After reviewing Graham's criminal history and hearing from Rose Durant and Chad Durant, but prior to imposing sentence, the trial court noted that the State was requesting restitution of $400 per month for Chad Durant. Defense counsel objected to the imposition and amount of restitution. The court expressed doubt about its ability to award restitution as a monthly amount, but it stated that it would "order restitution to the extent it's

possible."

{¶ 53} After the court imposed prison sentences, notified Graham of his post-release control obligation, and addressed other sentencing matters, restitution was again discussed. The prosecutor informed the trial court that Chad Durant had just told her that his medical expenses to date were $1,500. Defense counsel again object to the imposition of restitution and the amount. The court questioned Graham's ability to pay restitution,[1] but asked if a hearing were necessary on the amount of restitution. The State asserted Graham was required to request a hearing prior to sentencing, but it indicated that Chad Durant was available and could testify about his medical expenses. When asked how much the State was claiming, the prosecutor reiterated, "It's $400 a month for his prescriptions due

---

[1] When imposing financial sanctions, a trial court must consider an offender's present and future ability to pay. R.C. 2929.19(B)(5). The trial court may comply with its obligation by considering a presentence investigation report, which includes information about the defendant's age, health, education, and work history. *State v. Ratliff*, 194 Ohio App.3d 202, 2011-Ohio-2313, 955 N.E.2d 425, ¶ 12 (2d Dist.).

Throughout the discussions concerning restitution, the trial court repeatedly commented on whether Graham was capable of paying restitution. When restitution was first raised, the trial court stated, "I don't know what the point of ordering restitution would be? I don't think this Defendant is capable of — * * * he would be unable to produce any restitution under the circumstances." The State responded that restitution could be taken from Graham's prison account and he would be responsible for the rest after the prison sentences were served. The court indicated that it would award restitution. Later during the sentencing hearing, the court again expressed, "I don't see how he can pay it. * * * [O]ne would kind of assume in a situation he's been put in, he's not going to have any money. But you don't know, he could come into money. He gets some money, I think, in prison. And I think I should order restitution. If he can never pay it, so be it. He can't be asked to do the impossible." The court ordered Graham to pay $1,500 in restitution.

Graham's assignment of error does not specifically address the issue of Graham's ability to pay restitution. The record reflects that the trial court thought about Graham's ability to pay and, despite its expressed doubts, it apparently concluded that Graham could pay restitution from his prison account. Graham was 36 years old. In his statement to the court at sentencing, Graham informed the court that he had been a barber for 25 years, and there is no reason to believe that Graham could not continue as a barber upon his release from prison. Moreover, although Graham received a lengthy sentence, the court could reasonably conclude that he could earn money in prison. Considering the amount of restitution involved, the record supports a conclusion that Graham had a present and future ability to pay the restitution.

to his injuries. And it's ongoing. He's still taking them. It's $1,500 up until this day, but he continues to take them."

**{¶ 54}** The State called Chad Durant to testify about his medications. He testified that he takes pain medication and Neurontin, which is a "nerve pill". Chad stated that he will be taking Neurontin for the rest of his life; his doctor did not give him an estimate of how long he would be taking the pain medication. These prescriptions cost him (out-of-pocket) $200 per month each, for a total of $400 per month. Chad stated that he had paid $1,500 to date.

**{¶ 55}** Defense counsel objected to an order of restitution for future medical expenses, and the court agreed. The court ordered restitution of $1,500.

**{¶ 56}** Contrary to Graham's assertions, the trial court did not award $1,500 in restitution without a hearing. In response to defense counsel's objections regarding the imposition and amount of restitution, the State offered the testimony of Chad Durant. The evidence at trial established that Graham shot Chad Durant three times, which caused nerve damage that severely limited Chad's use of his arm and hand. Durant's testimony at the sentencing hearing further established that, as a result of Graham's actions, Durant had incurred out-of-pocket medical expenses of $400 per month, totaling $1,500 at the time of sentencing. Defense counsel did not ask for a continuance so that he could obtain additional information about Chad Durant's medical condition and/or expenses or otherwise challenge Chad Durant's testimony regarding his out-of-pocket medical expenses. The trial court's taking of evidence on the issue of restitution at the sentencing hearing was sufficient to constitute a "hearing" for purposes of R.C. 2929.18(A)(1).

{¶ 57} We also find no fault with the trial court's reliance on Chad Durant's testimony to support its restitution order. As stated above, R.C. 2929.18(A)(1) expressly permits the trial court to base the amount of restitution it orders on an amount recommended by the victim, provided that the recommended amount does not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. The testimony of a victim, if determined to be credible, is sufficient to support a restitution order; no documentation is required to substantiate the victim's testimony. *See Dolphin*, 2d Dist. Montgomery No. 25695, 2014-Ohio-3434, at ¶ 29*; State v. McClain*, 5th Dist. Licking No. 2010 CA 39, 2010-Ohio-6413, ¶ 34 ("R.C. 2929.18(A)(1) allows the trial court to rely upon the amount of restitution recommended by the victim, and does not require written documentation."); *State v. Bowman*, 191 Ohio App.3d 407, 2009-Ohio-1281, 909 N.E.2d 170, ¶ 12 (2d Dist.) ("Documentary and/or testimonial evidence must be introduced to demonstrate the victim's economic loss.").

{¶ 58} We note that R.C. 2929.18(A)(1) also authorizes a trial court to consider amounts stated in a presentence investigation report in determining the amount of restitution. R.C. 2930.13(C)(2), which concerns victim impact statements in presentence investigation reports, states that the victim impact statement may include "[a]n explanation of the extent of any property damage or other economic loss suffered by the victim as a result of that crime * * *."

{¶ 59} Regardless of whether the State could have offered documentary evidence to substantiate the amount of Chad Durant's out-of-pocket medical expenses, the trial court was permitted to base its restitution order on Durant's testimony alone. The trial court did

not abuse its discretion when it ordered restitution in the amount of $1,500.

{¶ 60}   Graham's third assignment of error is overruled.

## IV.   Conclusion

{¶ 61}   Graham's sentence will be reversed and vacated, and the matter will be remanded to the trial court for resentencing.   *Bonnell*, ¶ 37.   In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Kirsten A. Brandt
Jeffrey T. Gramza
Hon. Timothy N. O'Connell
Hon. Thomas J. Crush, Visiting Judge